**Slip Op. 01-83**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
             :

TUNG MUNG DEVELOPMENT CO., LTD.,   :
             :

        Plaintiff,        :      Before: WALLACH, Judge
             :      Consol. Court No.: 99-07-00457

    and            :
             :

YIEH UNITED STEEL CORP.,      :
             :

        Plaintiff-Intervenor,   :      **PUBLIC VERSION**
             :

    v.            :
             :

UNITED STATES,         :
             :

        Defendant,       :
             :

    and            :
             :

ALLEGHENY LUDLUM CORP. et al.,   :
             :

        Defendant-Intervenors.  :
_____ :

[Plaintiff's motion for judgment on the agency record DENIED. Plaintiff-Intervenor's motion for judgment on the agency record DENIED. Final Determination REMANDED.]

                                 Decided: July 3, 2001

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Patrick F. J. Macrory, Spencer S. Griffith, Karen L. Bland, Thomas J. McCarthy), for Plaintiff.

White & Case (William J. Clinton, Osamu Umejima, Adams Lee), for Plaintiff-Intervenor.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; Velta Melnbrencis, Assistant Director; Lucius B. Lau, Karla J. De Steuben, Commercial Litigation Branch, Civil Division, Department of Justice; Patrick Gallagher, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

Collier Shannon Scott, PLLC (David A. Hartquist, Jeffrey S. Beckington, Adam H. Gordon), for Defendant-Intervenors.

**OPINION**

**WALLACH, Judge.**

**I**

**INTRODUCTION**

This case is before the court upon Plaintiff Tung Mung Development Co., Ltd.'s ("Tung Mung") USCIT Rule 56.2 Motion For Judgment On The Agency Record, and Plaintiff-Intervenor Yieh United Steel Corp.'s ("YUSCO") Rule 56.2 Motion For Judgment Upon The Agency Record, both of which challenge the decision of the U.S. Department of Commerce, International Trade Administration (the "Department," "Commerce" or "ITA") in Notice of Final Determination of Sales at Less Than Fair Value:  Stainless Steel Sheet and Strip in Coils From Taiwan, 64 Fed. Reg. 30,592 (Dep't Commerce) (June 8, 1999) ("Final Determination").

Tung Mung and Plaintiff-Intervenor YUSCO challenge the Department's decision to assign a single, weighted average cash deposit dumping rate to their merchandise, regardless of the channel of distribution through which that merchandise is sold.   Tung Mung and YUSCO argue that imposition of a single rate is contrary to congressional intent, and would impose an excessive cash deposit rate on merchandise that is not "tainted" by the middleman dumping found by the Department.  The court remands the Department's determination.

YUSCO also challenges four other aspects of the Final Determination:  (1) the Department's determination that certain sales characterized by YUSCO as indirect export sales were in fact home market sales; (2) the Department's decision to apply total adverse facts available, on the basis of YUSCO's failure to report a significant percentage of its home market sales; (3) the Department's inclusion of certain other sales within YUSCO's export sales database; and (4) the Department's determination to adjust YUSCO's reported cost of manufacture based on YUSCO's submission of accounting records that reflected a higher cost of

manufacture than YUSCO reported.  The court denies YUSCO's motion on these issues.


## II

## BACKGROUND


On June 10, 1998, the domestic industry filed an antidumping petition alleging that imports from Taiwan of stainless steel sheet and strip in coils ("SSSS") were being injuriously dumped in the United States.  The Department initiated an antidumping duty investigation on July 13, 1998.  See Initiation of Antidumping Duty Investigations:  Stainless Steel Sheet and Strip in Coils From France, et al., 63 Fed. Reg. 37,521 (Dep't Commerce) (July 13, 1998).

YUSCO and Tung Mung, Taiwanese producers of the subject merchandise, were selected as respondents in the Taiwan investigation.  During the period covered by the Department's investigation, April 1, 1997 - March 31, 1998, YUSCO and Tung Mung made United States sales of subject SSSS through middleman Ta Chen Stainless Pipe Co., Ltd. ("Ta Chen")[1].

On August 3, 1998, Commerce sent a questionnaire to YUSCO and the other respondents.  The instructions to Section B of the questionnaire required the respondents to report all sales of the subject merchandise in the home market of Taiwan or a third country market during the period of investigation ("POI").  In pertinent part, the questionnaire instructed respondents to

> If known, identify customers that export some or all of their purchases of the
> foreign like product.  Explain how you determined which sales were for
> consumption in the foreign market.

Questionnaire at B-13.  On September 25, 1998, YUSCO submitted its responses to Section B

---

[1]    Ta Chen was also investigated as part of this investigation.  Ta Chen has not appealed Commerce's determination of dumping and assignment of a cash deposit rate, which was issued on the basis of adverse facts available.
    Tung Mung also made direct sales to the United States, to an affiliate of Ta Chen.

and C of Commerce's questionnaire, stating that it had reported "all sales of subject merchandise in the home market made during the period of investigation." Response to Questionnaire, dated September 25, 1998, at B-2. At that time, YUSCO also submitted computer printouts listing those sales. On November 2, 1998, Commerce sent YUSCO a supplemental questionnaire for sections A, B and C. YUSCO responded on November 18, 1998.

On October 14, 1998, petitioners submitted allegations of middleman dumping by Ta Chen of subject merchandise produced by Tung Mung; on October 15, 1998, petitioners submitted allegations of middleman dumping by Ta Chen of subject merchandise produced by YUSCO. On December 3, 1998, the Department initiated a middleman dumping investigation with respect to sales by Ta Chen of YUSCO's and Tung Mung's subject merchandise. On January 4, 1999, Commerce published its preliminary determination. Notice of Preliminary Determination of Sales at Less Than Fair Market Value and Postponement of Final Determination: Stainless Steel Sheet and Strip in Coils From Taiwan, 64 Fed. Reg. 101 (Dep't Commerce) (Jan. 4, 1999) ("Preliminary Determination"). In the Preliminary Determination, Commerce calculated a weighted average dumping margin of 2.94 percent for YUSCO and a weighted average dumping margin of .07 percent for Tung Mung, in each instance exclusive of any dumping by the middleman. Id. at 108. Commerce made no preliminary determination with regard to the middleman dumping investigation, which was incomplete.

On January 8, 1999, shortly before the January 18-22, 1999 time scheduled for verification of YUSCO's sales, YUSCO submitted additional information concerning its home market sales. This additional information included some details regarding sales designated by YUSCO as "UZ" sales. Letter from White & Case to Commerce, dated January 8, 1999, containing corrections to and clarifications of YUSCO's earlier response (the "1/8/99 Supplemental Response"). YUSCO stated in the 1/8/99 Supplemental Response that the UZ sales consisted of sales "to customers in Taiwan who informed YUSCO that they would export

YUSCO's SSSS to third countries after their further processing the SSSS." Id. at 4. On January 13, 1999, the Department issued a supplemental questionnaire requesting that YUSCO provide additional information regarding the UZ sales referenced in the 1/8/99 Supplemental Response. Commerce letter dated 1/13/99.

On January 15, 1999, YUSCO responded to the January 13, 1999 Supplemental Questionnaire. In response to Commerce's question as to whether YUSCO considered the UZ sales to be home market, United States, or third country sales in the context of the investigation, YUSCO responded that it believed those sales to be third country sales, and stated that although it "generally knew or presumed at the time of sale that the merchandise would be further-processed prior to export, YUSCO did not know the extent of further processing or the final product that would result from further processing," and that YUSCO "did not know whether the final exported product was subject or non-subject merchandise." YUSCO Jan. 15, 1999 Response to Suppl. Questionnaire at Sup. D-1. In response to another question by Commerce as to whether YUSCO had "additional sales to home market customers that were not further-processed, but for which you claim knowledge of export to countries other than the United States", YUSCO explained in this January 15, 1999 submission that it had made additional indirect export sales, which it identified as "U*" sales, to home market customers who informed YUSCO of the final export destination of the merchandise. Id. at Sup. D-3 to Sup. D-4. YUSCO further explained that its "U*" and "UZ" designations were part of its order coding system, and were assigned by YUSCO's staff based on oral information from the customer. Id. at Sup. D-4. The assignment of these designations did not take into account whether or not the merchandise remained in the form of subject merchandise at the time of ultimate export.

The Department conducted a sales verification of YUSCO's questionnaire responses on January 18 through 22, 1999. During that investigation, Commerce interviewed a number of employees in YUSCO's sales department. The responses provided by these employees indicated

that they either knew that some or all of YUSCO's customers further manufactured its subject merchandise, or had no specific knowledge as to whether the SSSS was further manufactured prior to export.[2]  YUSCO Facts Available Memorandum at 1; Sales Verification Report Ex. 7.

On April 12, 1999, Commerce issued a verification report for YUSCO.  The parties to the investigation submitted briefs on April 20, 1999.  On May 3, 1999, the parties submitted an additional round of briefs, devoted to the issue of middleman dumping by Ta Chen.  On May 19, 1999, the Department released its Facts Available Memorandum, in which it determined that it was required to apply total adverse facts available to YUSCO, in light of YUSCO's failure to report its UZ and U* sales as home market sales, its disregard for Commerce's instructions as to what sales to include within its reported home market sales, and its exclusive reliance on an internal sales classification system which the Department concluded was flawed.  YUSCO Facts Available Memorandum at 2-3.  Also on May 19, 1999, the Department placed on the record of this investigation the YUSCO Sales Verification Report from the investigation of Notice of Final Determination of Sales at Less Than Fair Value:  Stainless Steel Plate in Coils From Taiwan, 64 Fed. Reg. 15,493 ("Dep't Commerce") (March 31, 1999) ("SSPC from Taiwan" or "SSPC").  Memo from  Gideon Katz of Commerce to File, dated May 19, 1999.

On May 25, 1999, YUSCO wrote to Commerce, protesting the inclusion of information from SSPC from Taiwan in the file of this investigation, as a violation of the Administrative Protective Order in SSPC from Taiwan.  Letter from White & Case to Commerce, dated May 25, 1999.  On May 28, 1999, YUSCO's counsel again wrote to Commerce, this time identifying a number of alleged ministerial errors in the Final Determination, which had been announced on May 19, 1999.  Letter from White & Case to Commerce, dated May 28, 1999.  These alleged

---

[2]     None of the responding employees stated that they knew that YUSCO's customers did not further manufacture the subject merchandise.  All of the other responses – in which the employees either lacked knowledge, or knew of further manufacture – support Commerce's determination, and contradict YUSCO's claims.

ministerial errors included: the decision to apply facts available based on YUSCO's responses regarding the U* sales, the Department's conclusion that the information submitted by YUSCO regarding the UZ sales was incomplete and thus unusable, and the Department's reliance on information from <u>SSPC from Taiwan</u>. <u>Id.</u> On this last point, YUSCO argued that "[i]f anything, the example cited by the Department from the stainless steel plate case shows that YUSCO's system captured any sales that the Department could have considered to be home-market sales." <u>Id.</u> at 17. On June 4, 1999, petitioners submitted a response to YUSCO's allegations of ministerial error. Also on June 4, 1999, the Department wrote to counsel for YUSCO, responding to the May 25, 1999 letter to clarify that no business proprietary information from <u>SSPC from Taiwan</u> was placed on the record in this investigation. On July 7, 1999, the Department issued a Memorandum rejecting each of YUSCO's allegations of ministerial error.

On June 8, 1999, Commerce published its <u>Final Determination</u> in this investigation, in which it assigned YUSCO a total adverse facts available single weighted average rate of 34.95 percent; it assigned Tung Mung a single weighted average rate of 14.95, based largely on the rate assigned for middleman Ta Chen.


### III

### ANALYSIS

### A

### <u>Jurisdiction and Standard of Review</u>

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).

In reviewing the <u>Final Determination,</u> the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law". 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a

conclusion.  Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380
(1993); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966
(1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).  "As long as the agency's methodology and
procedures are reasonable means of effectuating the statutory purpose, and there is substantial
evidence in the record supporting the agency's conclusions, the court will not impose its own
views as to the sufficiency of the agency's investigation or question the agency's methodology."
Ceramica Regiomontana, S.A., 10 CIT at 404-5, 636 F. Supp. at 966.

## B

### Tung Mung's Motion

Plaintiff[3] contests Commerce's decision to assign a single, weighted average antidumping
cash deposit rate to all sales of Tung Mung merchandise, whether sold directly by Tung Mung to
customers in the United States or sold to Ta Chen and resold by it in this country.  In the Final
Determination, Commerce found that Tung Mung had a dumping margin of 0.0% on its direct
sales to the United States, and of .06% on its sales to Ta Chen -- both well below the de minimis
threshold set forth in 19 U.S.C. § 1673b(b)(3) (1994).   Commerce assigned Ta Chen a margin of
15.34% to sales by Ta Chen of product produced by Tung Mung and YUSCO, based on
Commerce's application of total adverse facts available to Ta Chen.[4]  Commerce then weight-
averaged these sales and applied a single rate to Tung Mung of 14.95%, and a single rate to
YUSCO of 34.95%.[5]

---

[3]     YUSCO makes arguments in its Motion which echo those raised by Tung Mung.
Both parties' arguments on the issue of a single weighted average dumping rate are addressed in
this subsection.

[4]     The rate assigned to Ta Chen is not at issue in this case.

[5]     Commerce concluded that Tung Mung was not eligible for exclusion under the de
minimis standard based on this weighted average dumping margin.

Tung Mung and YUSCO now raise several arguments that the Department should have assigned separate, or combination, cash deposit antidumping rates to Tung Mung and YUSCO, without weight-averaging their rates with that of Ta Chen.[6] Defendant and Defendant-Intervenors argue that the dumping statute and Commerce's regulation support Commerce's determination and that Commerce's decision to impose a single, weighted average rate is entitled to deference. Because the court finds no express statutory or regulatory authority for single, weighted average rates in middleman dumping cases, and because the court finds that Commerce has not adequately explained its decision not to follow its prior practice of issuing combination rates, the court concludes that remand is proper. A detailed review of the parties' contentions follows.

## 1.

### Plain Language of the Statute

Tung Mung claims that Commerce's decision to assign a single rate is inconsistent with the language of the dumping statute. Memorandum in Support of Plaintiff Tung Mung Development Co. Ltd.'s Rule 56.2 Motion for Judgment on the Agency Record ("Tung Mung Moving Brief") at 13. Tung Mung argues that the statutory definition of "dumping margin" precludes the imposition on a producer of a rate based in whole or in part on an "export price" derived from a sale by an entity other than that producer.[7] Id. 19 U.S.C. § 1677(35)(A) defines "dumping margin" as "the amount by which the normal value exceeds the export price . . . of the

---

[6]     A "combination rate", also referred to as a "separate" or "channel" rate, refers to a method by which each producer and each exporter is assigned its own rate, and the rate applied to imported subject merchandise consists of a combination of the individual rates of the producer of the goods and the exporter through whom the producer has sold the goods.

[7]     Tung Mung also seeks exclusion from the order on the grounds that its margin is de minimis, under the definition set forth in 19 U.S.C. § 1673d(a)(4) (1994). Tung Mung Moving Brief at 6, 17. It does not, however, provide any argument that § 1673d(a)(4) requires its exclusion as de minimis, or requires the use of combination rates to ensure exclusion of respondents with a de minimis rate based on their direct sales.

subject merchandise." 19 U.S.C. § 1677(35)(A) (1994). 19 U.S.C. § 1677a(a) then defines

"export price" as "the price at which the subject merchandise is first sold . . . <u>by the producer or</u>

<u>exporter</u> of the subject merchandise outside of the United States to an unaffiliated purchaser in

the United States or to an unaffiliated purchaser for exportation to the United States . . . ." 19

U.S.C. § 1677a(a) (1994) (emphasis supplied). Tung Mung contends that the emphasized

language requires that Tung Mung's export price, and by extension its cash deposit rate, be based

on Tung Mung's sales to Ta Chen ("an unaffiliated purchaser for exportation to the United

States") and Tung Mung's direct sales to the United States, rather than Ta Chen's sale price to its

customers.[8] Tung Mung Moving Brief at 13.

Similarly, Tung Mung cites the definition of "normal value," set forth at 19 U.S.C. §

1677b(a)(1)(B)(i): "the price at which the foreign like product is <u>first sold</u> . . . for consumption

in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i) (1994) (emphasis added). Tung Mung

argues that the dumping margin for Tung Mung's direct sales to the United States, where no

middleman is involved, <u>must</u> be based only on the prices of sales by Tung Mung to Ta Chen and

Tung Mung's direct sales to the United States (the "first sales" under § 1677b(a)(1)(B)), and not,

in whole or in part, on the prices of an unaffiliated middleman. Tung Mung Moving Brief at 14.

Neither Defendant nor Defendant-Intervenors state that Tung Mung's construction of this

provision is inaccurate, much less why it might be so. However, even assuming that construction

to be accurate, it is not dispositive as to whether the statute permits the issuance of a single,

---

[8]    This reasoning is undercut, however, by 19 U.S.C. § 1677(28), which defines "exporter or producer" to mean "the exporter of the subject merchandise, the producer of the subject merchandise, <u>or both where appropriate</u>." 19 U.S.C. § 1677(28) (1994) (emphasis supplied). This definition might reveal an ambiguity in the provision cited by Tung Mung, which thus does not mandate the result it urges. However, none of the parties have cited this provision, nor does the court find any authority construing it in any context.

weighted average dumping margin in middleman dumping cases.[9]

Defendant cites 19 U.S.C. § 1673d(c),[10] the statutory provision which provides

Commerce with the underlying authority to compute a dumping margin and impose a cash

deposit rate. Defendant's Memorandum in Opposition to Plaintiff's and Plaintiff-Intervenor's

Motions for Judgment Upon the Agency Record ("Defendant's Opposition Brief") at 18. The

antidumping statute does not provide guidance for the Department on exercising the discretion

granted to it in § 1673d(c)(1)(B) for the calculation of cash deposit rates, and it says nothing

---

[9]     Tung Mung has not argued that Commerce erred in computing either normal value or export price; rather, it appears to imply that the use of a single weighted average dumping rate would, working backwards, render those predicate figures flawed. Tung Mung has cited no authority to support such an approach.

Tung Mung and YUSCO also argue that the method used by the agency to compute the cash deposit rate must be "reasonably correct", though they concede that these rates need not be absolutely accurate. See Torrington Co. v. United States, 44 F.3d 1572, 1579 (Fed. Cir. 1995) ("Title 19 requires only cash deposit estimates, not absolute accuracy. These estimates need only be reasonably correct pending the submission of complete information for an actual and accurate assessment."); Asociacion Colombiana de Exportadores de Flores v. United States, 6 F. Supp. 2d 865, 905 (CIT 1998). As noted in these cases, cash deposit rates represent estimated antidumping duties on future entries. 19 U.S.C. § 1673f provides for refund or collection of over- and under-payment of estimated duty deposits. 19 U.S.C. § 1673f(a) (1994). Of course, better estimates produce fewer and less costly reviews. In any event, however, this argument is not dispositive of the issues presented to the court in this case.

[10]     19 U.S.C. § 1673d(c) provides, in pertinent part:
(1)     Effect of affirmative determination by the administering authority
If the determination of the administering authority under subsection (a) of this section is affirmative, then –
    * * *
(B)
(i)     the administering authority shall–
        (I)     determine the estimated weighted average dumping margin for each exporter and producer individually investigated, and
        * * *
(ii)     the administering authority shall order the posting of a cash deposit, bond, or other security, as the administering authority deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, whichever is applicable . . . .
19 U.S.C. § 1673d(c)(1) (1994).

whatsoever about middleman dumping rates.  Defendant argues that it "complied with this provision, which provides little guidance as to how cash deposit rates are to be determined."  Id. at 18.

Defendant also argues that it is authorized by statute to consider the "full range of dumping," although it cites no statutory provision utilizing this term, nor does it detail why a combination rate would not capture the "full range of dumping."  Id.  Defendant cites 19 U.S.C. § 1673b(a) and 1673d(a), together with the legislative history to 19 U.S.C. § 1677a,[11] as its authority to "consider the full range of dumping."[12]  Id. at 21.  That concept is neither implicitly nor explicitly found in any of these cited provisions.[13]

---

[11]      This legislative history relates to a term – "purchase price" – which is not employed in the current version of the cited statutory subsection.  In any event, this legislative history would appear to support Tung Mung's position, because it provides that "if a producer knew that the merchandise was intended for sale to an unrelated purchaser in the United States under terms of sale fixed on or before the date of importation, the producer's sale price to an unrelated middleman will be used as the purchase price."  S. Rep. No. 96-249 at 94 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 480; and H.R. Rep. No. 96-317 at 75 (1979) (emphasis added).  While that history goes on to indicate that Commerce should examine sales to and by middlemen to avoid below cost sales by the middlemen, that latter comment does not speak to or modify the purchase price definition.

[12]      Defendant-Intervenors also adopt the "full range of dumping" expression, and argue that "Tung Mung has blurred the distinction between computing the extent of Tung Mung's dumping and Commerce's authority to consider the full range of dumping and arrive at an overall weighted-average dumping margin[.]"  Brief of Defendant-Intervenors in Response to Motion for Judgment on the Agency Record by Tung Mung Development Co., Ltd. at 11.  Clear statutory principles, however, authorize the assessment of dumping margins.  See 19 U.S.C. § 1673d(c)(5)(B)(i).  There is no statutory authority for the "full range of dumping" argument, nor is there statutory authority for the use of single weighted average margins for middleman dumping, which comes about, if at all, only through Commerce's authority to fill in the gaps in the antidumping law.

[13]      However, 19 U.S.C. § 1673d(a)(4) (1994) does require Commerce to "disregard any weighted average dumping margin that is de minimis as defined in section 1673b(b)(3) of this title" – a provision that is plainly at odds with Commerce's position that the statute provides it with a mandate to consider the "full range of dumping."  Congress, by mandating the exclusion of parties with a dumping margin of up to two percent, has deliberately elected not to pursue antidumping duties on the "full range of dumping."

Defendant-Intervenors, in turn, argue that the plain language of the dumping statute forecloses Tung Mung's argument. They contend that the focus of the dumping statute is on whether the <u>subject merchandise</u> (the unstated implication being that the "subject merchandise" means "all subject merchandise produced by a given producer"; <u>see</u> Transcript of April 11, 2001 oral argument ("Tr.") at 90) has been dumped in the United States, regardless of whether the dumping was done by the producer or a middleman. Brief of Defendant-Intervenors in Response to Motion for Judgment on the Agency Record by Tung Mung Development Co., Ltd. ("D-I Opposition Brief") at 5. "Subject merchandise" is defined in 19 U.S.C. § 1677(25) (1994) (in pertinent part) as "the class or kind of merchandise that is within the scope of an investigation[.]" This definition does not provide any guidance in the instant case, and does not support Defendant-Intervenors' argument. Indeed, given that many investigations involve merchandise produced by several different respondents, Defendant-Intervenors' construction of that term is untenable for use throughout the statute.[14]

Defendant-Intervenors attempt to support the subject merchandise argument, citing <u>Jia Farn Mfg. Co. v. U.S. Dep't of Commerce</u>, 17 CIT 187, 817 F. Supp. 969 (1993). That case hinged on whether Commerce retained jurisdiction to conduct an administrative review in connection with allegations that a manufacturer, who had been excluded from an antidumping

---

The court notes that the statutory de minimis exclusion does not detail the means by which the "weighted average dumping margin" is calculated, and is not dispositive of the issues presented in the instant case.

[14]      As Tung Mung notes, the "subject merchandise" argument would, if adopted, prohibit Commerce from ever issuing combination rates, though Commerce's own regulations recognize its authority to do so. Tung Mung Development Co., Ltd.'s Reply Memorandum to: Defendant's Memorandum in Opposition to Plaintiff's and Plaintiff-Intervenor's Motions for Judgment Upon the Agency Record and Defendant-Intervenors' Brief in Response to Judgment on the Agency Record by Tung Mung Development Co., Ltd. ("Tung Mung Reply Brief") at 4.

order,[15] was transshipping underline subject merchandise produced by other manufacturers who were subject to the order. The court concluded that "exclusion of a firm from the order applies only when the firm acts as in the same capacity as it was excluded from the order. In the case of plaintiff, the exclusion from the order applies so long as it acts as an exporter of the sweaters it produces because the zero percent dumping margin was assigned to the sweaters it produces." Id., 817 F. Supp. at 973. When the plaintiff began shipping the subject merchandise of other producers to whom a rate had been assigned, Commerce had jurisdiction to collect duties on the merchandise shipped by Jia Farn from the other producers.

Defendant-Intervenors cite Jia Farn in support of their argument that "only subject merchandise with a zero or de minimis margin of dumping is eligible for exclusion." D-I Opposition Brief at 17.[16] This argument lacks relevance to the current inquiry for at least two reasons. First, the court was not construing the statutory provisions nor the regulation at issue here. Second, the decision in Jia Farn was necessary to eliminate a means of circumvention, by which producers subject to an order could avoid payment of any antidumping duties (including the all-others rate that would have applied to an exporter not specifically included within the terms of the order) by selling through a producer/exporter that had been excluded. See Jia Farn, 17 CIT at 190, 817 F. Supp. At 972 ("Plaintiff claims because it obtained the negative determination as an exporter, the company is excluded from any administrative review regardless of whether it exports the sweaters manufactured by itself or by others under the order."). Put simply, Jia Farn forbade the use by "upstream" producers or exporters of "downstream" sellers to evade antidumping duties imposed on the "upstream" parties.[17] In the instant case, however,

---

[15]     Jia Farn did not discuss the manner in which the plaintiff's de minimis margin had been set.

[16]     The court finds no case citing Jia Farn for such a proposition.

[17]     A similar analysis applies to the regulations cited by Defendant-Intervenors in further support of their subject merchandise argument. 19 C.F.R. 351.204(e)(3)(i), regarding

Commerce is attempting to impose the liability of a downstream exporter[18] on an upstream

producer/exporter, although the record does not reflect any way in which Tung Mung has

attempted to use Ta Chen as a "front". Jia Farn is simply inapposite.

At least one part of the antidumping statute, however, does categorize the goods by their

producer. Specifically, the term "foreign like product", which is integral to the definition of

"normal value" cited by Tung Mung, is defined in pertinent part as merchandise which "was

produced in the same country by the same person as" the subject merchandise. 19 U.S.C. §

1677(16).[19] The antidumping statute does, thus, trace goods by their producer, for purposes of

establishing normal values. It also tracks goods by producer to avoid the types of jiggery pokery

described in Jia Farn. The statute does not, however, mandate the imposition on the producer of

any downstream dumping of its goods.

Tung Mung notes that 19 U.S.C. § 1673d(c)(1)(B)(i), which is cited by Defendant and the

Defendant-Intervenors, requires Commerce to "determine the estimated weighted average

dumping margin for each exporter and producer individually investigated." 19 U.S.C. §

1673d(c)(1)(B)(i) (1994) (emphasis added). The plain language of this provision supports Tung

---

exclusions, provides that
> In the case of an exporter that is not the producer of subject merchandise, the
> Secretary normally will limit an exclusion of the exporter to subject merchandise
> of those producers that supplied the exporter during the period of investigation.

19 C.F.R. 351.204(e)(3)(i) (1998). When this regulation was promulgated, Commerce explained
that "[t]his limitation is appropriate, because the lack of knowledge [of exportation] by these
producers provided the basis for investigating and establishing a rate for the exporter."
Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg. 27,296, 27,310 (Dep't
Commerce) (May 19, 1997) (the Supplementary Information of which is referenced herein as the
"Preamble").

[18]     The court has not located, nor were the parties able to cite, any case imposing
liability of a downstream exporter on an upstream producer.

[19]     The definition of "export price" does not trace the goods by their producer; it
simply looks to the price of sale of any generic subject merchandise, produced by any respondent,
at the time of its first sale by a producer or an exporter.

Mung's position; it tends to indicate that a separate dumping rate must be computed for each respondent.[20] This construction is supported by Commerce's own regulation, at 19 C.F.R. § 351.204(c)(1) (1998), which states that "[i]n an investigation, the Secretary will attempt to determine an individual weighted-average dumping margin . . . for each known exporter or producer of the subject merchandise."

The dumping statute doesn't say whether a middleman's dumped sales of a producer's subject merchandise justifies imposing a single rate. Where a statute is ambiguous or silent on a specific issue, and it is apparent from the agency's generally conferred authority and other statutory circumstances that Congress expects the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, a reviewing court "is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable." United States v. Mead, 2001 WL 672258 at *6 (U.S. June 18, 2001). "[T]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." Id.; see also Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). Agency "[i]nterpretations ... in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law -- do not warrant Chevron-style deference." Christensen v. Harris County, 529 U.S. 576, 587 (2000). Agency interpretations which lack the force of law are "entitled to respect ... but only to the extent that those interpretations have the 'power to persuade'." Id., citing Skidmore v. Swift & Co., 323 U.S. 134,

---

[20]　　Reference to 19 U.S.C. § 1677(28), which defines "exporter or producer" to mean "both where appropriate", would, on the other hand, prompt the conclusion that the provision cited by Tung Mung is ambiguous. However, neither party has cited, much less analyzed, § 1677(28), and the court finds no cases construing this provision.

140 (1944).  Not surprisingly, Commerce argues that the decision of whether to impose a single

rate or a combination rate is committed to its discretion, under the relevant regulation –  19

C.F.R. § 351.107 -- and the preamble thereto.  Commerce further argues that its "interpretation of

its own regulation is entitled to deference."  Torrington Co. v. United States, 82 F.3d 1039, 1050

(Fed. Cir. 1996).

Section 351.107 provides in pertinent part:

(b)      Cash deposit rates for nonproducing exporters-

(1)      Use of combination rates–
(i)      In general.   In the case of subject merchandise that is exported to
the United States by a company that is not the producer of the
merchandise, the Secretary may establish a "combination" cash
deposit rate for each combination of the exporter and its supplying
producer(s).

(ii)     Example.  A nonproducing exporter (Exporter A) exports to the
United States subject merchandise produced by Producers X, Y,
and Z.  In such a situation, the Secretary may establish cash deposit
rates for Exporter A/Producer X, Exporter A/Producer Y, and
Exporter A/Producer Z.

19 C.F.R. § 351.107(b) (1998) (emphasis added).  The cited portion of the regulation never says

of what type of cash deposit rate will be established if a combination rate is not used, nor how

that alternative rate would be calculated.  Thus, the regulation cited by Commerce does not speak

directly to the issue presented in this case – derivation of a single, weighted average rate from the

rates of two unaffiliated companies.

Defendant and Defendant-Intervenors also cite the Preamble to 19 C.F.R. § 351.107.[21]  It

does not, however, provide any direct support for Commerce's decision in the instant case.  That

Preamble identifies circumstances in which the use of combination rates would or would not be

---

[21]      The Preamble is not part of the governing regulations set forth in the CFR.
Rather, it is described by Commerce as "supplementary information", published
contemporaneously with the regulations.  Antidumping Duties; Countervailing Duties; Final
Rule, 62 Fed. Reg. at 27,296.

appropriate.  It does not, however, discuss the use of a single, weighted average rate at any point.

Indeed, where the Preamble does reference the use of other, non-combination rates, it discusses

employing the rate assigned to the  producer <u>or</u> to the non-producing exporter (middleman).

While the parties have cited only narrow portions of the Preamble, the court finds a broader

review provides greater insight into the agency's intended meaning of certain relevant terms.

Review of the entirety of the Preamble also renders more striking the absence of any reference to

the single weighted average methodology.

   The Preamble provides, in part:

> We have added a new §351.107 that deals with (1) the establishment of
> deposit rates in situations involving a nonproducing exporter, (2) the selection of
> the appropriate deposit rate where entry documents do not identify the producer of subject merchandise, a
nonmarket economy countries.

> Nonproducing exporters:  In the AD Proposed Regulations, 61 FR at 7311,
> the Department requested additional public comment on the issue of whether to
> promulgate special rules regarding the rates applicable to exporters that are not
> also producers, such as trading companies.  We noted that one alternative would
> be to calculate a separate rate for each exporter/producer combination.[22]

> One commenter suggested that the Department should apply this approach
> in all instances.  Other commenters argued that the Department should not codify
> an across-the-board rule, but instead should establish rates for exporter/producer
> combinations on a case-by-case basis.  Another commented that it would be
> inappropriate to determine rates solely on the basis of exporter/producer
> combinations, and that normally the Department should base deposits of estimated
> duties on the rate calculated for the producer.

<u>Antidumping Duties; Countervailing Duties: Final Rule</u>, 62 Fed. Reg. 27,296, 27,302-303

(1997).  The Preamble continues:

> The Department agrees with the comments suggesting that it is appropriate
> in some instances to establish rates for exporter/producer combinations.
> Therefore, in paragraph (b)(1)(i), we have provided for the establishment of such
> "combination rates."

---

[22]  In the Proposed Regulations, Commerce did not detail any of the other
alternatives.

We believe that combination rates are appropriate, because, in an AD proceeding, the Department <u>usually investigates or reviews sales by a nonproducing exporter only if that exporter's supplier sold the subject merchandise to the exporter without knowledge that the merchandise would be exported to the United States</u>.  While we agree with one commenter that in these instances the producer's pricing is not at issue [implying, then, that there is no need for a combination rate, but only for a rate for the exporter alone], we are concerned about the proper application of any deposit rate determined on the basis of the exporter's pricing.  Establishing a deposit rate for an exporter and, without regard to the identity of the supplier, applying that rate to all future exports by that exporter could lead to the application of that rate even if other suppliers sold to the exporter with knowledge of exportation to the United States.  This would enable a producer with a relatively high deposit rate to avoid the application of its own rate by selling to the United States through an exporter with a low rate. [So Commerce implicitly rejects the approach of imposing a rate only on the exporter, without regard to the producer.]  Therefore, in order to ensure the proper application of deposit rates, the Department believes that it should establish, where appropriate, individual rates for nonproducing exporters in combination with the particular supplier or suppliers from whom the exporter purchased the subject merchandise.

<u>Id.</u>, 62 Fed. Reg. at 27,303 (emphasis added).  Defendant cites the preceding passage, arguing that it establishes Commerce's "discretion to use channel rates or a single rate in situations it deems appropriate."  Defendant Opposition Brief at 20.  While the Preamble states that Commerce "may" use a combination rate, it does not discuss the use of a single weighted average rate in the middleman dumping context, and that passage does not mention a "single rate" at all.  And, while Defendant-Intervenors cite the Preamble, they do not indicate how it authorizes the single weighted average method.  Indeed, in the second paragraph quoted above at p. 18, Commerce states that "the producer's pricing is not at issue" in the "instances" where a nonproducing exporter is investigated <u>and</u> the producer sold without knowledge.  This implies, then, that in such circumstances, the producer's rate is essentially assumed to be zero, since they had no knowledge of export.  Here, Tung Mung's rate has been found to be zero or its de minimis equivalent.  Thus, in the Preamble's hypothetical situation, Commerce concludes that a

combination rate is proper.      The Preamble continues, outlining three different situations as

examples of instances in which a combination rate may be impractical or inappropriate:[23]

>        On the other hand, the Department believes that there are situations where
> it may be inappropriate and/or impractical to establish combination rates.[24]  For
> example, it may not be necessary to establish combination rates when
> investigating or reviewing nonproducing exporters that are not trading companies,
> such as original equipment manufacturers.  In addition, it may not be practicable
> to establish combination rates when there are a large number of producers, such as
> in certain agricultural cases.  The Department will make such exceptions to
> combination rates on a case-by-case basis.
>        Another instance in which the Department assigns rates to exporters is in
> AD investigations and reviews of imports from nonmarket economies (NMEs).  In
> those cases, if sales to the United States are made through an NME trading
> company, we assign a noncombination rate to the trading company regardless of
> whether the NME producer supplying the trading company has knowledge of the
> destination of the merchandise.  One exception to this NME practice occurs where
> we find no dumping and exclude an exporter from an AD order.  Where
> exclusions are involved, we publish a combination rate to address the same
> concerns described above regarding redirection of exports through an excluded
> trading company.  Nothing in §351.107(b)(1) is intended to change our policy for
> assigning rates in NME proceedings.
>        <u>The Department also believes it is not appropriate to establish combination
> rates in an AD investigation or review of a producer; i.e., where a producer sells
> to an exporter with knowledge of exportation to the United States.  In these
> situations, the establishment of separate rates for a producer in combination with
> each of the exporters through which it sells to the United States could lead to
> manipulation by the producer.</u> Furthermore, the Department recognizes that in

---

[23]        Section 351.107(b)(2) contemplates another circumstance when a combination
rate would not be employed:

>        In the case of subject merchandise that is exported to the United States by a
>        company that is not the producer of the merchandise, if the Secretary has not
>        established previously a combination cash deposit rate under paragraph (b)(1)(i)
>        of this section for the exporter and producer in question or a noncombination rate
>        for the exporter in question, the Secretary will apply the cash deposit rate
>        established for the producer.  If the Secretary has not previously established a cash
>        deposit rate for the producer, the Secretary will apply the "all-others" rate[.]

19 C.F.R. § 351.107(b)(2) (1998).


[24]        The record does not reflect any finding by Commerce that it would be
impracticable to apply a combination rate in this situation.

many industries it is not uncommon for a producer to sell some amount of
merchandise purchased from other producers.  In such situations, the Department
generally intends to establish a single rate for such a respondent based on its status
as a producer, although unusual circumstances may warrant the application of a
combination rate.

Id., 62 Fed. Reg. at 27,303 (emphasis added).

In the first full paragraph quoted on this page, the implication is that a single rate will be

imposed on the original equipment manufacturer or the agricultural exporter, without regard to

the rate of the producer. In the next quoted paragraph, regarding NMEs, it appears that a single

rate is applied for the exporter only.[25]  Defendant and Defendant-Intervenors cite the first and last

sentences of the third quoted paragraph as providing the authority for the single weighted average

rate.  Tung Mung, on the other hand, argues that this paragraph does not apply to the situation

where there has been a finding of dumping by the middleman.  Rather, Tung Mung states, this

discussion pertains to the situation when a producer sells through a middleman, and there is a

finding of dumping at the level of the producer's sale, but the middleman is not named as a

respondent or there is no finding that the middleman has dumped.  Id. at 12.  Tung Mung argues

that in such a situation, the statement that the "Department generally intends to establish a single

rate for such a respondent based on its status as a producer" comports with the general practice of

imposing a rate on a producer, without regard to the actions of the middleman.  Id.[26]  This

reading is buttressed by the earlier statement in the Preamble that Commerce "usually

investigates or reviews sales by a nonproducing exporter only if that exporter's supplier sold the

---

[25]     The application of the rate to the exporter, rather than the producer, appears to
contravene Defendant-Intervenors' "subject merchandise" argument, because it does not require
tracking the goods by producer.

[26]     Indeed, there is no mention of a single weighted average rate here or elsewhere.

subject merchandise without knowledge that the merchandise would be exported to the United

States." Preamble, 62 Fed. Reg. at 27,303. In other words, the normal situation is that either (1)

the producer did not know that the exporter was sending its merchandise to the United States and

Commerce thus investigates the exporter and not the producer, or (2) the producer did know that

the exporter was sending its merchandise to the United States and Commerce investigates the

producer and not the exporter; investigation of both is an "unusual circumstance." See Tr. at 67,

69.

> The Preamble continues, speaking in the context of countervailing duties:
>
> > In the case of CVD proceedings, subject merchandise may be subsidized
> > by means of subsidies provided to both the producer and the exporter. In the
> > Department's view, all subsidies conferred on the production of subject
> > merchandise benefit that merchandise, even if it is exported to the United States
> > by a reseller rather than the producer itself. Therefore, the Department calculates
> > countervailable subsidy rates on the basis of any subsidies provided to the
> > producer, as well as those provided to the exporter in any investigation or review
> > involving exports by a nonproducing exporter. As a result, rates established for
> > particular combinations of exporters and producers are the most accurate rates.
> > Moreover, as in an AD proceeding, combination rates help to ensure the proper
> > application of combination rates when other producers sell through the same
> > exporter.
> > As in AD proceedings, in CVD proceedings there may be situations in
> > which it is not appropriate or practicable to establish combination rates. In such
> > situations, the Department will make exceptions to its combination rate approach
> > on a case-by-case basis.

Id., 62 Fed. Reg. at 27,303 (emphasis added). The underlined language in the preceding

paragraph appears to further undercut Commerce's post-hoc explanation for its ruling in the

instant case. The cited passage uses the "subject merchandise" language that drives Defendant-

Intervenors' single weighted average argument before this court. Here, however, where

Commerce states an intention to calculate rates based on transactions at both the producer and

the exporter levels (exactly the situation before the court now), it states that "rates established for

particular combinations of exporters and producers are the most accurate rates." Id.  In the next

two sentences, Commerce specifically connects the methodology to that used in an AD

proceeding.  And in the final situation, Commerce indicates that in both antidumping cases and

countervailing duty cases are to be the default method, and special circumstances must apply to

warrant another approach.[27]  The Preamble continues:

> Nonmarket economy cases: The second sentence of the definition of

---

[27]     The court has reviewed the published decisions in which Commerce has cited 19 C.F.R. § 351.107.  In each case, Commerce has found some "exception" which warrants the use of a method other than the combination rate norm set through its notice-and-comment rulemaking process.  See, e.g., Certain Welded Carbon Steel Pipes and Tubes From Turkey; Final Results of Countervailing Duty Administrative Review, 65 Fed. Reg. 49,230, 49,230 (Dep't Commerce) (2000) ("we determine that it is not appropriate to establish combination rates . . . based on the fact that the subsidies conferred upon the subject merchandise were received by the producer only.  Therefore, combination rates would serve no practical purpose.  Instead, we have only calculated one rate, for . . . the producer of the subject merchandise."); Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea, 64 Fed. Reg. 73,176, 73,178 (Dep't Commerce) (1999) ("we have determined that it is not appropriate to establish combination rates . . . based on two main facts: first, the majority of the subsidies conferred upon the subject merchandise were received by the producers.  Second, the difference in the levels of subsidies . . . among the individual trading companies is insignificant.  Therefore, combination rates would serve no practical purpose because the calculated [combination] rate [for each producer/exporter combination] . . . would effectively be the same rate."); Preliminary Negative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination: Structural Steel Beams From the Republic of Korea, 64 Fed. Reg. 69,731, 69,733 (Dep't Commerce) (1999) ("we preliminarily determine that it is not appropriate to establish combination rates . . . based on two main facts: First, the majority of subsidies conferred upon the subject merchandise were received by the producers.  Second, the difference in the levels of subsidies . . . [to] the individual trading companies . . . is insignificant.  Thus, combination rates would serve no practical purpose because the calculated [combination] rate [for each producer/exporter combination] . . . would effectively be the same rate."); Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from the Republic of Korea, 64 Fed. Reg. 30,636, 30,641 (Dep't Commerce) (1999) (same); Final Negative Countervailing Duty Determination: Stainless Steel Plate in Coils From the Republic of Korea, 64 Fed. Reg. 15,530, 15,532 (Dep't Commerce) (1999) (same).  In all of these cases, Commerce employed a weighted average method, even though the Preamble states that the combination rate approach is for all but exceptional cases.  It appears that Commerce has, without notice and comment, developed a practice which differs from the norm articulated in its Preamble.

"rates" in proposed §351.102(b) provided the Department with the authority to apply a single AD margin to all producers and exporters from a nonmarket economy ("NME") country. We have moved that sentence to paragraph (d) of §351.107.

As explained in the AD Proposed Regulations, 61 FR at 7311, the Department elected not to codify its current presumption that a single rate will be applied in NME cases. We received several comments on this issue.

Four commenters suggested that the Department codify its current presumption of a single rate. Three of these commenters viewed the presumption as correct, because the fact that a country is an NME carries with it an assumption that the government controls all exporters. Moreover, these commenters asserted that NME governments, due to their control, can funnel sales of the subject merchandise through, or transfer production of the subject merchandise to, the entity that receives the most favorable dumping margin.
* * *

As in the proposed regulations, we have refrained from codifying the presumption of a single rate in NME AD cases. Nor have we adopted a modified version of the presumption. We appreciate the many thoughtful comments that we received on this topic. However, because of the changing conditions in those NME countries most frequently subject to AD proceedings, we do not believe it is appropriate to promulgate the presumption or the separate rates test in these regulations. Instead, we intend to continue developing our policy in this area, and the comments that were submitted will help us in that process. We would like to clarify, however, that we do intend to grant separate rates in appropriate circumstances, and that our decision not to codify the presumption or the separate rates test should not be seen, as one commenter suggested, as a decision not to grant separate rates. Also, as discussed above in connection with §351.107(b)(1), we intend to continue calculating AD rates for NME export trading companies, and not the manufacturers supplying the trading companies.

Id., 62 Fed. Reg. 27,304-305 (emphasis added). This last excerpted section is instructive in several respects. First, this Preamble section, and in particular the last quoted sentence, rebuts Defendant-Intervenors' "subject merchandise" argument: AD rates are repeatedly discussed as applying to producers and/or middlemen, not to "merchandise." Second, this section discusses at length the use of a single rate (though not a single weighted average rate), suggesting[28] that is it

---

[28] This section of the Preamble, regarding rates for NME respondents, is one of only two mentions of a single rate in the Preamble governing §351.107. The absence of this term elsewhere underscores the exceptional nature of single rates under §351.107. The use of this term also highlights the fact that Commerce was aware of the option of single rates, and did not specify their use in the circumstances presented in this case.

appropriate only where there is an actual finding of central influence over the pricing of the exporter – namely, in the case of a nonmarket economy, where, by definition, the government is "pulling the strings" controlling the exporter. There is no finding of such control in this case, and no mention in any other part of the Preamble of the possibility of such a finding.

Defendant and Defendant-Intervenors have argued that the use of a combination rate here would permit Tung Mung to avoid paying any dumping duties, by selling directly to the United States or through another channel of distribution. They argue that a single rate is necessary to ensure that Tung Mung be covered by any dumping order, to preclude the possibility of manipulation. See Defendant Opposition Brief at 20; D-I Opposition Brief at 20.

Commerce points to the Preamble, see supra at p. 20, in which it has essentially adopted knowledge of exportation as evidence that a producer knew of the exporter's dumping and assisted in that dumping. Defendant-Intervenors argue that "trading companies typically operate at small mark-ups and presumably do not take losses" and that "Ta Chen's apparent willingness to engage in middleman dumping was thus aberrational and peculiar behavior that the Department properly exercised it authority to scrutinize." D-I Opposition Brief at 17 n.24.[29] Defendant and Defendant-Intervenors contend that there should be a presumption that Tung Mung colluded with Ta Chen in dumping, because Tung Mung knew that Ta Chen would export its subject merchandise to the United States. See, e.g., Tr. at 67-68. In support of this argument, Defendant and Defendant-Intervenors cite to the Preamble.[30]

The Preamble, although it was issued after the notice-and-comment rulemaking procedure

---

[29]     Defendant-Intervenors also argued that Ta Chen's decision not to contest Commerce's decision was suspicious, such that it was indicative of collusion. D-I Opposition Brief at 17 n.24; Tr. at 69. In fact, Ta Chen benefits from a single, weighted average rate in which its rate is averaged with the much lower rate of Tung Mung. Ta Chen's incentives for appeal do not mirror those of Tung Mung.

[30]     Defendant and Defendant-Intervenors have not cited any statutory basis, nor basis in the regulation itself, for such a presumption.

that went into 19 C.F.R. § 351.107, is a policy statement, and not an agency interpretation that holds the "force of law", such as would be entitled to deference under Christensen.   It does not articulate the reason for the presumption it summarily references; failing that, the court finds it unpersuasive under Skidmore.   Commerce notes that all of Tung Mung's sales of subject merchandise to the United States, whether directly or indirectly, are to or through Ta Chen or its affiliates, and argues that this indicates collusion in dumping.   Final Determination, 64 Fed. Reg. at 30,605; Tr. at 31.  Defendant-Intervenors argue that Tung Mung, not Ta Chen, in fact absorbed the loss resulting from this dumping, through some arrangement between the two companies.

During verification, however, Commerce examined the relationship between the two parties and found no affiliation.  The record contains no evidence of such collusion, and Defendant and Defendant-Intervenors acknowledge that the investigation yielded no evidence of affiliation between the two companies.  Tr. at 15, 23 and 64.  The court has been presented with no factual reason to conclude that Ta Chen did not engage in dumping for the same reason producers do:  to retain or gain market share.[31]

The court's research, and the responses of the parties at oral argument, reveal only two instances in which a dumping margin is based on the activities of parties other than the respondent at issue:  in nonmarket economy cases, and in "collapsing" cases, where Commerce has made findings to support a determination that affiliated companies should be treated as a single entity, and thus receive a single, weighted average dumping margin.  See, e.g., Asociacion Colombiana, 6 F. Supp. 2d at 892-96.  Each of these situations requires a finding of affiliation between the parties whose margins are to be combined; no such finding is present here.  The

---

[31]     At one point in oral argument, an attorney attributed alleged "national characteristics" to certain parties.  The court interrupted that line of argument, ordered that it not be raised again, and admonished counsel, who repeatedly apologized.  The court here notes that admonition not to further chastize counsel, but rather to reiterate the impropriety of any such argument before this, or any, court of the United States.

imputed knowledge rationale referenced in the Preamble, assuming it could be construed to require the use of a single weighted-average rate, does not rise to a similar level, sufficient to justify a single weighted average rate for two unaffiliated entities.

Defendant-Intervenors have taken the position that, once a middleman dumping investigation is launched and a middleman is found to have dumped, a producer respondent can never be excluded. The contention has no basis in the statute, and in this case, another producer, Chang Mien, was excluded from the order.

Review of the Preamble provides no support for the use of a single, weighted average rate, and certainly does not mandate such a method. It does not even contain a discussion of such a rate in this context. To the contrary, a review of all of the Preamble indicates that a combination rate may well be proper in the instant case, although the court defers to Commerce's authority to make the determination as to whether a combination rate or some other rate is appropriate. However, this Preamble, and the associated regulation, do not constitute an agency construction of the statute at issue, on the issue of a single, weighted average rate, such as would trigger Chevron deference. The agency is quite silent, in this regulation and Preamble, on the issue of a single, weighted average rate in the context of a middleman dumping investigation. There is thus nothing there for the court to analyze for reasonableness or substantial evidence.

The cited statutory provisions do not support nor explicitly foreclose Commerce's use of the single, weighted average cash deposit rate. The new regulation cited by Commerce – 19 C.F.R. § 351.107 – explicitly provides for combination rates, but does not require the use of combination rates, and provides no indication whatsoever as to the situations in which another type of rate might be used, nor the type of rate that might be used. Commerce then cites the Preamble, which reiterates that the combination rate methodology is the norm, but allows Commerce to use an unspecified other method in where a combination rate is "impractical" or "inappropriate". The Final Determination in this case represents the first instance in which

Commerce has articulated a position of requiring single weighted average rates in middleman dumping cases. Nor has Tung Mung[32] or YUSCO demonstrated that the statute or regulation requires reversal of Commerce's determination in this regard. The court will look, then, to the agency's prior practice in this area.

**2.**

**Reasons for Reversal of Policy**

Tung Mung correctly notes that this is the first instance in which the Department has imposed a single weighted average dumping rate in a middleman dumping investigation, and argues that this reversal is contrary to Commerce's prior practice. In the Final Determination, Commerce stated that it was examining this issue for the first time since its decision in Fuel Ethanol from Brazil, in which Commerce imposed separate, or combination, rates.[33]

---

[32]      Tung Mung also argues that Commerce's imposition of a single rate improperly penalizes Tung Mung for pricing decisions made by Ta Chen, an unaffiliated company over which Tung Mung has no control. Tung Mung Moving Brief at 14. Because the court has decided to order a remand on the issue of the proper rate, this argument is moot. However, were the court to reach this argument, it would be constrained to reject it, at least on the grounds offered. Tung Mung bases its argument on the 1974 amendments to the Antidumping Act, which ended the practice of using other producers' home market sales as a basis for the normal value of a producer that had no home market sales, citing "occasional inequities" which resulted from "rendering [producers] liable to the imposition of dumping duties on the basis of prices which they cannot control and may not even know about." Report of the Committee on Finance, United States Senate, on H.R. 10710 (Report No. 93-1298, 93rd Cong., 2nd Sess.), Nov. 26, 1974, at 177. Tung Mung argues that "[w]e are aware of no other situation in which a foreign producer is held liable under the antidumping law for the pricing actions of an unaffiliated entity which it cannot influence or control." Tung Mung Moving Brief at 16.

        This statutory provision does not govern the situation at issue here. Tung Mung does not cite to any relevant provision of the Antidumping Act, the accompanying regulations, or case law in support of its argument, which is essentially equitable in nature. Tung Mung is essentially arguing that Commerce's construction of its own regulation, regarding the decision of whether to issue combination or single rates, is inequitable. Such an argument is insufficient as a matter of law in light of the deference generally accorded to Commerce under Chevron.

[33]      That is not entirely accurate; in its SSPC From Taiwan decision, decided by Commerce less than three months prior to the decision now before this court, Commerce imposed combination rates on the producer and the middleman. This aspect of the decision in

Antidumping:  Fuel Ethanol from Brazil; Final Determination of Sales at Less Than Fair Value,
51 Fed. Reg. 5,572 (Dep't Commerce) (1986) ("Fuel Ethanol from Brazil").  Defendant-
Intervenors note correctly that "there seem to have been just three occasions on which the
Department has rendered final affirmative middleman dumping determinations:"  SSPC From
Taiwan, Fuel Ethanol from Brazil, and the instant case.  D-I Opposition Brief at 18.

In Fuel Ethanol from Brazil, Commerce decided to impose a combination rate for
Copersucar, a consortium of producers, "based on its sales to a trading company other than [the
middleman found to have dumped the subject merchandise], because Copersucar knew the
destination of the ethanol prior to the sale and because Copersucar filed an adequate response."
Id., 51 Fed. Reg. at 5,575.   Commerce rejected the argument that "[s]ince virtually all of the fuel
ethanol sold by Copersucar for export to the United States was sold to [the dumping middleman],
and since [the dumping middleman] was selling at less than its acquisition cost plus expenses," a
single rate was proper.  Id.

An administrative agency has the authority to change or revoke its policies and practices,
if a reasonable explanation is provided for the change.  American Silicon Technologies v. United
States, 118 F. Supp. 2d 1329, 1331 (CIT 2000).  The court will review an agency's change of
position or practice to determine whether the action was arbitrary and capricious, and will find
the change arbitrary unless it is supported by substantial evidence.  Id.  The underlying rationale
of this principle is that the reviewing court should be able to understand the basis of the agency's
action and so may judge with consistency of that action with the agency's general mandate.  The
rule also ensures that an agency will be "faithful and not indifferent to the rule of law", and
"prohibits the agency from adopting significantly inconsistent policies that result in the creation

SSPC From Taiwan was remanded to Commerce for further consideration in light of 19 C.F.R. §
351.107, and Commerce has since issued a remand determination applying a single, weighted
average rate.  Tung Mung notes, however, that Commerce sought that remand only after Tung
Mung filed its Rule 56.2 Memorandum in this case.

of conflicting lines of precedent governing the identical situation." <u>Cultivos Miramonte S.A. v.</u>

<u>United States</u>, 21 CIT 1059, 1064 n.6, 980 F. Supp. 1268, 1274 n.6 (1997) (citations and

punctuation omitted).  <u>See also</u> <u>Allegheny Ludlum Corp. v. United States</u>, 112 F. Supp. 2d 1141,

1147 (CIT 2000) ("Accordingly, it is well-established that Commerce may depart from a prior

practice so long as it provides a 'reasoned analysis' for its change.").  "The case for judicial

deference is less compelling with respect to agency positions that are inconsistent with

previously held views."  <u>Hylsa, S.A. v. United States</u>, 1998 WL 51731, *3 (CIT Feb. 3, 1998);

<u>see also</u> <u>Mead</u>, 2001 WL 672258 at *6 ("the fair measure of deference to an agency

administering its own statute has been understood to vary with circumstances, and courts have

looked to the degree of the agency's care, <u>its consistency</u>, formality, and relative expertness, and

to the persuasiveness of the agency's position") (emphasis added).

Commerce's decision in the instant case represents a clear reversal of its prior practice set

forth in <u>Fuel Ethanol</u>.  Commerce and the Defendant-Intervenors claim that the approach used in

<u>Fuel Ethanol</u> was expressly altered by 19 C.F.R. § 351.107.[34]  Defendant Opposition Brief at 25;

---

[34]     Commerce now states that its "practice generally has been to favor a single, weighted-average dumping margin for each producer or exporter."  Defendant Opposition Brief at 24, citing <u>Ferrovanadium and Nitrided Vanadium from the Russian Federation: Notice of Final Results of Antidumping Duty Administrative Review</u>, 62 Fed. Reg. 65,656, 65,659 (Dep't Commerce) (1997) ("<u>Ferrovanadium</u>").  Commerce did not reference <u>Ferrovanadium</u> in the <u>Final Determination</u>, however, and this appears to be a <u>post hoc</u> rationalization, which this court will not entertain.

Tung Mung argues that <u>Ferrovanadium</u> supports its position, to the extent that it refers to "a number of past determinations where the Department has refused to establish producer/exporter combination rates, except where a producer/exporter margin is found to be zero or de minimis and thus excluded from an antidumping order."  <u>Ferrovanadium</u>, 62 Fed. Reg. at 65,659; Tung Mung Reply Brief at 5-6.  Tung Mung apparently reads this excerpt to mean that the Department has refused to establish combination rates except where a producer <u>or</u> an exporter margin is found to be zero or de minimis.  This excerpt in context does not support that reading.  Rather, it appears that the Department has refused to establish a combination rate except where the averaging used in the single rate method yields a rate below the de minimis threshold, and use of a combination method would permit the Department to impose a margin on one of the two parties that is above the de minimis threshold.  <u>Ferrovanadium</u>, 62 Fed. Reg. At 65,659.

D-I Opposition Brief at 19.

Close examination of Fuel Ethanol, § 351.107, and the decision below are necessary to determine whether Commerce has provided a "reasonable explanation for the change." The decision to impose a combination rate in Fuel Ethanol was predicated on four facts: (1) the producer had sold to a trading company other than the middleman found to have dumped the subject merchandise; (2) the producer knew the subject merchandise was for export to the United States; (3) the producer filed an adequate response; and (4) the subject merchandise was sold to the dumping middleman to the extent there were almost no sales through any other channel. Each of these facts is identical to the findings vis-a-vis Tung Mung in the instant case. Two questions thus arise: First, does 19 C.F.R. § 351.107 directly alter the analysis relating to one or more of these four factual grounds for the ruling in Fuel Ethanol; and second, did Commerce otherwise provide a "reasonable explanation" supported by substantial evidence in the Final Determination below, regarding the reasons for its change in practice?

In the Final Determination, Commerce did not attempt to distinguish Fuel Ethanol. It did, however, offer two grounds to distinguish its imposition of combination rates in SSPC, stating that

> in that determination, YUSCO sold the subject merchandise to the United States only through Ta Chen and the dumping margin on that channel was above de minimis, such that we were not faced with the same factual situation in the instant case. . . . [Here,] both Tung Mung and YUSCO had a small volume of sales to the United States not subject to our current middleman investigation. Moreover, in the Preliminary Determination, we determined that on an overall basis, neither Tung Mung nor YUSCO had estimated dumping margins that exceeded the de minimis level such that the possibility of exclusion existed for these firms.

Final Determination, 64 Fed. Reg. at 30,605. Commerce did not, however, provide any explanation as to how these facts tied into the rationale for a single as opposed to a combination rate.

Review of this record compels the conclusion that Commerce has indeed changed its

prior practice with regard to the imposition of combination rates where there is a finding of middleman dumping and the producer is a named respondent. Commerce has failed to provide any explanation for this change in practice, nor has it provided substantial evidence to support the change.[35]

"[T]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertise, and to the persuasiveness of the agency's position." Mead, 2001 WL 672258 at *6. In this Final Determination, the agency's stated rationale, while arrived at in the course of a formal adjudication, is far from persuasive in supporting its conclusion that the statute, regulation, and/or Preamble require or warrant the use of a method other than the normative combination rate. Nor is that rationale consistent with the agency's prior position on identical facts. Under the Chevron and Mead standards, Commerce's position articulated in the Final Determination is entitled to deference only under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), to the extent that it has the power to persuade. The Final Determination provides no persuasive factual or legal rationales for an agency departure from the norms articulated in the regulation and Preamble, nor from the Fuel Ethanol practice.[36]

Remand is therefore required on the issue of the single, weighted average rate. Commerce shall either provide a reasonable explanation and substantial evidence for its change

---

[35]     Tung Mung argues that Commerce's decision to impose a single rate was a "results-oriented approach", and is thus improper. Tung Mung Moving Brief at 10. Tung Mung cites Notice of Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Plate from Japan, 64 Fed. Reg. 24,329, 24,354 (Dep't Commerce) (1999), in which Commerce rejected a petitioner's claim, noting that "[t]o allow a respondent to choose between the Department's normal method and an alternative method simply because one method results in a lower rate, would be a results oriented approach", and by implication, improper. The court of course agrees that a results oriented approach would be improper.

[36]     Indeed, the application of a single weighted-average rate to two entities as to which there is no record evidence of affiliation may represent a significant departure from existing practice and law.

in practice, or shall apply a combination rate, consistent with its prior practice.[37]

**C**

**YUSCO's Motion**

YUSCO contests several aspects of the Final Determination.  Primarily, YUSCO challenges Commerce's decision to resort to adverse facts available under 19 U.S.C. § 1677e(b) (1994).  Central to its challenge on the facts available issue is YUSCO's contention that the Department improperly determined that sales reported by YUSCO as export sales were in fact home market sales, and that YUSCO's failure to report these home market sales warranted the application of adverse facts available.  YUSCO also argues that Commerce improperly included sales by an affiliated company, Yieh Mau, among YUSCO's United States sales listings.

YUSCO also challenges another aspect of the Final Determination which, because of the Department's resort to adverse facts available, was not material to the Department's calculation of the cash deposit rate ultimately assigned to YUSCO.  Specifically, YUSCO argues that the Department improperly adjusted its reported cost of production ("COP"), due to discrepancies between those reported costs and the costs reflected in YUSCO's accounting records.

These claims are examined in turn below.

**1**

**Commerce Properly Invoked 19 U.S.C. § 1677e to Apply Adverse Facts Available**

In the Final Determination, Commerce concluded that the use of facts available was proper, based on Commerce's conclusion that YUSCO had failed to report "a large portion" of sales "possibly consumed by home market customers."  Final Determination, 64 Fed. Reg. at 30,597-8.  Specifically, Commerce found that, as to the UZ sales, "these sales must be included in a normal value calculation for YUSCO because YUSCO has not demonstrated that it knew

---

[37]     On remand, Commerce may also analyze the relevance of Ferrovanadium or any other relevant precedent.

that the SSSS from these sales was not consumed in the home market." Final Determination, 64

Fed. Reg. at 30,598. Regarding U* sales, Commerce stated that YUSCO "did not submit a U*

sales listing and it did not provide evidence that this merchandise was exported as subject

merchandise." Id. In both types of sales, Commerce noted that YUSCO had not "reported the

individual sales transaction data necessary to conduct the dumping analysis." Id. Commerce

agreed that YUSCO did at least submit UZ sales listings, but said this information was "grossly

incomplete and thus unusable for our dumping calculation purposes," and, as it was submitted

late, on January 11, 1999, Commerce "had no opportunity to issue supplemental questionnaires

regarding these sales." Id. at 30,599. The Department also expressed doubt as to the reliability

of YUSCO's internal reporting methodology, in light of the Department's earlier findings in

SSPC, and concluded that "[b]ecause YUSCO's reliance on this internal classification of home

market and third country sales for reporting sales to the Department was inadequate, by relying

on it YUSCO failed to comply to the best of its ability with the Department's instructions." Id.

        Commerce further determined that the use of adverse facts available was appropriate,

because it concluded that YUSCO had failed to "cooperate to the best of its ability . . . because

YUSCO failed to follow the Department's instructions to report all home market sales." Id.

        Commerce made more detailed findings on these points in its Facts Available

Memorandum. Commerce cited YUSCO's November 18, 1998 Supplemental Questionnaire

Response, in which it stated that

> the majority of YUSCO's home market customers are further manufacturers
> [which] . . . produce different types of SSSS and/or non-subject merchandise from
> YUSCO's SSSS, and sell to their customers in the home market, U.S., and third
> countries. . . . YUSCO . . . does not know which [of] YUSCO's SSSS was further
> manufactured into different types of SSSS or into non-subject merchandise. Nor
> does YUSCO claim to know which [of] YUSCO's SSSS was finally destined to
> either the home market, the United States, or third countries.

Facts Available Mem. at 1, quoting YUSCO Suppl. Questionnaire Response at Sup. ABC-3-4,

dated November 18, 1998.[38]  Commerce concluded that the explicit terms of its original

questionnaire required YUSCO to report these sales of further-manufactured goods within its

home market sales database.  That questionnaire provided "instructions for reporting your sales

of the foreign like product in your home market or a third-country market."  YUSCO

Questionnaire at B-1.  "Foreign like product" was defined as "merchandise that is sold in the

foreign market and that is identical or similar to the subject merchandise.  When used in the

questionnaire, foreign like product means all merchandise that is sold in the foreign market and

that fits within the description of merchandise provided in Appendix III to the questionnaire."

YUSCO Questionnaire at I-9.

In explaining how to report customer codes for home market sales, the questionnaire

asked the respondent to "(i)f known, identify customers that export some or all of their purchases

of the foreign like product.  Explain how you determined which sales were for consumption in

the foreign market."  Final Determination, 64 Fed. Reg. at 30,598 (quoting Questionnaire at B-8).

The Department concluded that these instructions required YUSCO to include the UZ and U*

sales within their initial reported home market sales database.  Id.  Commerce cited INA

Walzlager Schaeffler KG v. United States, 21 CIT 110, 123-24, 957 F. Supp. 251, 264 (1997),

aff'd SKF USA Inc. v. INA Walzlager Schaeffler KG, 180 F. 3d 1370 (Fed. Cir. 1999), for its

position that sales should be excluded from the home market database only where a respondent

knew or had reason to know that merchandise was not sold for home market consumption –

knowledge that YUSCO did not have in light of its November 18, 1999 supplemental response.

Final Determination, 64 Fed. Reg. at 30,598.

---

[38]     YUSCO made this statement as part of its response to the following question by
Commerce:  "Describe in fuller detail the sales involving Yieh Mau.  With regard to sales of
subject merchandise, did Yieh Mau only further manufacture sell [sic] steel which it originally
purchased from YUSCO?  Does Yieh Mau purchase steel from other companies?"  YUSCO
Suppl. Questionnaire at 3.

YUSCO raises several arguments that the reclassification of its UZ and U* sales as home

market sales, and the application of facts available and adverse facts available, were not

supported by substantial evidence and were contrary to law.

**a**

**Commerce Properly Classified the U* and UZ Sales as Home Market Sales**

YUSCO contends that "the Department erred in determining YUSCO's third country

sales through its home market customers to be home market sales." Memorandum of Points and

Authorities in Support of Yieh United Steel Corp.'s Motion for Judgment Upon the Agency

Record ("YUSCO Moving Brief") at 23. YUSCO raises several arguments on this point, which

are addressed in turn below.

**(1)**

**Introduction of Sales Verification Report from <u>Stainless Steel Plate in Coils</u>**

YUSCO argues that the Department erred in incorporating its Sales Verification Report

(the "SVR") from the investigation of <u>SSPC</u> into the record of the instant investigation, and in

relying in part on the SVR in reaching its Final Determination. YUSCO argues, without citation

of authority, that the Department's use of this Report was illegal. YUSCO Moving Brief at 18-

19. YUSCO also argues the Report's introduction was untimely.[39] <u>Id.</u> at 20. In support of this

---

[39]     YUSCO also argues that these investigations involve different products and their
records should be separate. YUSCO Moving Brief at 19. The only case YUSCO cites on this
point is <u>Notice of Final Determination of Sales at Less Than Fair Value: Collated Roofing Nails
From the People's Republic of China</u>, 62 Fed. Reg. 51,410 (comment 11) (Dep't Commerce)
(1997). The case does not support YUSCO's position. There, a respondent argued that the
petitioner was barred from introducing new information into the investigation, because the
Department did not have sufficient time to collect and analyze the information necessary to make
a determination as to whether the cited rule applied. The case did not involve information
introduced by the Department, let alone information in another case to which the complaining
party had been a party.
       Indeed, it appears that the Department was under an obligation to take notice of this
information. As noted by this court, "[T]he record . . . is not limited solely to those documents
submitted to the ITA. The ITA may obtain information from public documents as long as it

argument, YUSCO cites 19 U.S.C. § 1677m(g), which provides as follows:

> <u>Information that is submitted</u> on a timely basis <u>to the administering authority</u> or the Commission during the course of a proceeding under this subtitle shall be subject to comment by other parties to the proceeding within such reasonable time as the administering authority or the Commission shall provide. The administering authority and the Commission, before making a final determination under section 1671d, 1673d, 1675, or 1675b of this title shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority . . . upon which the parties have not previously had an opportunity to comment.

19 U.S.C. § 1677m(g) (1994) (emphasis added). This statutory opportunity for comment applies only to information submitted "to" the administering authority, not "by" the administering authority; thus, this section is inapposite.

YUSCO then cites 19 C.F.R. § 351.301(c), which provides that "[a]ny interested party may submit factual information to rebut, clarify, or correct factual information <u>submitted by any other interested party</u> at any time prior to the deadline provided in this section for submission of such factual information." 19 C.F.R. § 351.301(c) (1998) (emphasis added). "Interested party" is defined at 19 U.S.C. § 1677(9) as:

> (A) a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise,
> (B) the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported,
> (C) a manufacturer, producer, or wholesaler in the United States of a domestic like product,
> (D) a certified union or recognized union or group of workers which is representative of

---

relates such information to the facts of the case before it, or the record may consist of those documents at the agency which become sufficiently intertwined with the relevant inquiry no matter how or when they arrived at the agency." <u>Sanyo Electric Co., Ltd. v. United States</u>, 86 F. Supp. 2d 1232, 1239 (CIT 1999) (citations and punctuation omitted). "The agency cannot ignore relevant information which is before it, and the reviewing court must be in a position to determine if it had done so." <u>Floral Trade Council of Davis, Cal. v. United States</u>, 13 CIT 242, 242-43, 709 F. Supp. 229, 230 (1989). Under this standard, the Department acted properly in incorporating the Sales Verification Report from <u>SSPC from Taiwan</u> to supplement the meager information provided by YUSCO.

an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product,

(E) a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States,

(F) an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), or (E) with respect to a domestic like product, and

(G) in any investigation under this subtitle involving an industry engaged in producing a processed agricultural product, as defined in paragraph (4)(E), a coalition or trade association which is representative of either--
> (i) processors,
> (ii) processors and producers, or
> (iii) processors and growers[.]

19 U.S.C. § 1677(9) (1994).  This definition does not, by its terms, include the Department.

Submissions by the Department are thus not included within the language of the cited regulation.

There appears to be no administrative mechanism for review of claims such as that raised by

YUSCO regarding the SSPC Sales Verification Report.  As a procedural matter, such claims are

presented for the first time to this court.

YUSCO then details the practical essence of its complaint regarding the introduction of

the Sales Verification Report from SSPC:  it was "deprived . . . of any opportunity to explain

that, contrary to what the Final Determination claims, YUSCO's internal order coding system

identified in the SSPC investigation actually proves that YUSCO did not under-report home-

market sales of SSSS because YUSCO's system captured any sales that the Department could

have considered to be home-market sales."  YUSCO Moving Brief at 21.[40]  YUSCO also claims

that it was deprived of "the right to comment on the relevancy and accuracy of the SSPC sales

verification report for purposes of the SSSS investigation."  Id.

YUSCO's own submissions in the instant case, however, document an order coding

---

[40]        YUSCO argues that Commerce misclassified one sale in SSPC, which YUSCO contends it properly classified as a "D" or home market sale, and that this led to an incorrect result in SSPC.  See YUSCO Moving Brief at 22.  This court has rejected the identical claim in its review of the SSPC decision, on both factual and legal grounds.  Allegheny Ludlum Corp. v. United States, Consol. Court No. 99-06-00369, slip op.  00-170 at 21-22 (CIT Dec. 28, 2000).  YUSCO has provided the court with no information which would render that decision incorrect.

system identical to that used by YUSCO in <u>SSPC</u>, and show this order coding system formed the

basis of YUSCO's characterization of its sales[41] in both cases. The Sales Verification Report in

<u>SSPC</u> reflects this commonality, and revealed further flaws in YUSCO's reporting in reliance on

its order coding system. YUSCO's own submissions acknowledge the relevance and similarity

of <u>SSPC</u>:

> YUSCO does not know whether customers of UZ Sales further-manufactured
> YUSCO's SSSS into merchandise outside the scope of this investigation before
> exporting the SSSS. YUSCO's customers did not provide this information to
> YUSCO. Upon request from the Department at the time of the sales verification
> in the antidumping investigation of <u>Stainless Steel Plate in Coils from Taiwan</u>,
> YUSCO obtained sample production and export documentation from one
> customer of UZ Sales. These documents showed that the customer further-
> manufactured some of YUSCO's stainless steel plates in coils into pipes and tubes
> and exported the same to a third country. YUSCO acquired this information,
> however, after the fact at the request of the Department. YUSCO made its
> January 8, 1999 submission to the Department because the verifier's requests in
> the Plate verification indicated that the Department would like to examine in more
> detail those sheet and strip sales that appeared to have been further-processed.

YUSCO Jan. 15, 1999 Response to Suppl. Questionnaire at Sup. D-2. The Department

reasonably placed public information from a parallel investigation on the record of this case, to

supplement a deficit of information received from the respondent. YUSCO has pointed to

nothing which would render the Department's decision in this respect to be illegal or improper.


(2)

**U\* Sales**

YUSCO raises several arguments in support of its assertion that Commerce erred in

concluding that the "U\*" sales were not third country sales, as reported by YUSCO, but should

rather have been reported as home market sales. The court examines each of these arguments in

turn.

---

[41]They were classified by YUSCO as home market, U.S., or third country.

YUSCO argues that Commerce improperly applied a statement from its November 18, 1999 response -- a statement that YUSCO claims was limited to Yieh Mau – to all of YUSCO's sales to home market customers, and that this determination then led Commerce to improperly determine that the "U*" sales were in fact home market sales. On its face, however, the quoted statement, taken in context, makes a pronouncement about customers other than Yieh Mau:

> YUSCO sells its SSSS to Yieh Mau, which is one of YUSCO's home market customers. Please see Exhibit 36 for a revised chart showing YUSCO's selling activities and services provided to home market customers. For YUSCO, its sales to Yieh Mau are at the same level of trade with YUSCO's sales to its other home market customers.
>
> As shown in YUSCO's customer lists in its Section B response at Exhibit 6, YUSCO sold SSSS to its home market customers, including certain further manufacturers. In fact, the majority of YUSCO's home market customers are further manufacturers. These further manufacturers produce different types of SSSS and/or non-subject merchandise from YUSCO's SSSS, and sell to its customers in the home market, U.S. and third countries. As stated above, YUSCO does not know which [of] YUSCO's SSSS was further manufactured into different types of SSSS or into non-subject merchandise. Nor does YUSCO know which [of] YUSCO's SSSS was finally destined to either of the home market, the United States, or third countries.
>
> YUSCO's sales to Yieh Mau therefore are at the same level of trade with YUSCO's other home market sales. Yieh Mau's sales to its home market customers are therefore at a different level of trade with YUSCO's home market sales.

YUSCO Nov. 18, 1999 Response to Suppl. Questionnaire at Sup. ABC 3-4 (emphasis added).

This response repeatedly juxtaposes information applicable to Yieh Mau in particular against that for all of YUSCO's home market customers. The latter comments are categorical in nature, and in fact reference other customers by name as examples. There is no basis for YUSCO's claim that its categorical statement was distorted by taking it out of context.

YUSCO claims that this statement "had nothing whatsoever to do with any 'U*' sales. . . . Thus, [it says,] there is no linkage between the quote excerpted from YUSCO's supplemental response and YUSCO's 'U*' sales that would justify the Department's conclusion that YUSCO's 'U*' sales were home market sales that YUSCO supposedly 'failed to report.' "

YUSCO Moving Brief at 13.

YUSCO itself, however, identified the U* sales as having been made to its home market customers, thus arguably bringing the U* sales under the reach of its November 18, 1999 description of its sales to home market customers. YUSCO Jan. 15, 1999 Response to Suppl. Questionnaire at Sup. D-3 to D-4 ("YUSCO also had other sales to home market customers, who informed YUSCO of the final export destination of YUSCO's SSSS at the time of sale . . . . These sales were coded 'U'[.]"). YUSCO, however, notes that the question in response to which it first identified the U* sales asked for "additional sales to home market customers <u>that were not further-processed, but for which you claim knowledge of export</u> to countries other than the United States?" YUSCO Jan. 13, 1999 Suppl. Questionnaire (emphasis added). That statement is the only information provided by YUSCO to Commerce regarding the U* sales, and that was provided three days prior to verification.

YUSCO's earlier generalized statements had informed the Department that the "majority" of its home market sales were further manufactured prior to export, and that YUSCO could not identify which sales were consumed to produce non-subject merchandise and which were consumed to produce other forms of SSSS. YUSCO Nov. 18, 1999 Response to Suppl. Questionnaire at ABC-4. This information, coupled with the Department's additional findings on YUSCO's U* sales in <u>SSPC</u>, provided a reasonable basis for Commerce's conclusions regarding the U* sales, in light of the paucity and tardiness of information submitted by YUSCO.[42] The argument must, then, be rejected. Based on YUSCO's own mixed responses, the

_____

[42]      YUSCO has argued that the Department should have known of the U* and UZ sales through its <u>SSPC</u> investigation. The Department did not, however, learn of those sales in that investigation until verification, which took place from December 14-17, 1998, only three weeks before YUSCO submitted the January 8, 1999 supplemental response in the instant case. <u>Allegheny Ludlum</u>, slip op. 00-170 at 34. Particularly in light of the intervening holiday season, the court cannot conclude that the government had any prior notice that would have called into question YUSCO's November 18, 1998 certification that its response was complete.

court cannot say that there is not substantial evidence to support Commerce's determination.[43]

YUSCO also claims that Commerce erred in the <u>Final Determination</u> in stating that it confirmed, by written questionnaires to 12 members of YUSCO's sales department, that YUSCO does not know which of YUSCO's SSSS was further manufactured, nor which was finally destined for the home market, the U.S., or third countries. YUSCO Moving Brief at 13 n.10; <u>see Final Determination</u> at 30,598. Specifically, YUSCO claims that "neither the questionnaire nor the company officials' responses distinguished among the types of customers and sales, and in particular did not distinguish the U* sales from other sales." YUSCO Moving Brief at 13 n.10. The record refutes YUSCO's claim.

The questionnaire to the 12 members of the sales department specifically asks, <u>inter alia</u>, "How do you know to code a sale to a Taiwanese company as a 'U' sale?" Sales Verification Report Ex. 7 at 7-1. The responses reflect this distinction, and elaborate upon it, noting that they use the code "U" for export or indirect export, and "D" or "S" for domestic sales; they also reference different customers by name. See id. at 7-2 through 7-49. These responses in fact support the Department's statement; they repeatedly indicate that the responding sales employee made the designations of U, D or S based on conversations with the customer; and that the customers further processed the material. [44]

---

[43]     YUSCO also argues that verification efforts by Commerce did not differentiate between the U* sales and other types of sales. YUSCO has not provided any evidence which would substantiate this claim. Certainly, the verification questionnaire did differentiate U* sales from other sales. Sales Verification Report Ex. 7 at 7-1.

[44]     Following is a sampling of the questions asked by the Department and some of the responses received:
3)a.     How do you assign the order number on the order acceptance (O.A.)?
- "D" - Production line; "S" - Inventory
- "according to the sales destination"
- "Export or Domestic Different Country"
- "the computer will bring out automatically"
- "UA–> U.S.A.; Q –> Europe; C–> South America; Z –> Indirect Export"

4)     What information do you base this decision on?
   - "the customer told the products they need; according the products list can tell what code to use"
   - "the customer request"
   - "according to the company's rules"
   - "according to the customer's need"
   - "according to company rules"

5)     How do you know to code a sale to a Taiwanese company as a "U" sale?
   - "'U' - for Export; 'D', 'S' for Domestic"
   - "for Export"
   - "U=for Indirect Export"
   - "I don't know"
   - "because 'U' means Export"

6)a.   Do your customers further-process the coil?
   - "Yes, they do."
   - "no"
   - "Yes"
   - "Yes"
   - "Some they do.  Some they don't."
   - "No."
   - "Some, they do and some I don't know very well"

6)b.   How do you know this?
   - "Contact with customer then know."
   - "the customer told"
   - "tour in factory"
   - "after talked to customer"
   - "according to the company's character.  Then I know."
   - "Because Direct Export"
   - "if I do, because the customer told"

7)     Which of your customer(s) [sic] ultimately sell sheet and strip to the United States?
   - "None"
   - "no"
   - "steel pipes; steel plates"
   - "No"
   - "I don't know.  (Maybe they do or other products spare parts.)"
   - "I'm not in charge of that area"
   - "HR, CR coils"

**(3)**

**UZ Sales**

YUSCO raises several arguments in support of its assertion that Commerce erred in concluding that the "UZ" sales were not export sales, as reported by YUSCO, but should rather have been reported as home market sales. The court examines each of these arguments in turn below.

YUSCO claims that Commerce ignored certain facts which, it argues, compel the conclusion that the "UZ" sales were for export. YUSCO Moving Brief at 13. YUSCO argues that Commerce erred in determining that the UZ sales information was "so incomplete that it cannot serve as a reliable basis for reaching our determination of normal value." Final Determination, 64 Fed. Reg. at 30,599; see YUSCO Moving Brief at 17. YUSCO contends that Commerce verified all UZ sales information, finding "no discrepancies." YUSCO Moving Brief at 17. At verification, however, Commerce only examined 27 UZ sales reported by YUSCO as sales to the United States, which YUSCO had erroneously classified as export sales. See YUSCO Sales Verif. Report at 8 and Ex. 5. These sales were not part of the UZ sales reported on January 8, 1999.

YUSCO then argues that "an overwhelming part" of "UZ" sales were to a bonded area. YUSCO Moving Brief at 26. The Verification Report does recite YUSCO's statement that Ta Chen, one of two recipients of the "UZ" sales, was located in a bonded area. Sales Verification Report at 7. YUSCO claims that Commerce verified that no SSSS "would be" reintroduced into the home market from the Ta Chen factory. YUSCO Moving Brief at 26. In actuality, the Verification Report contains no such statement, nor has YUSCO pointed to any other record

---

Sales Verification Report Ex. 7 at 7-2 through 7-49.

evidence that would support its assertion.[45]

YUSCO also argues that the verification report confirms YUSCO's characterization of the U* sales as export sales of subject merchandise. Id. at 15. The portions of the verification report cited by YUSCO only confirm, however, that the selected sales from the third-country printout contained sales of both subject and non-subject merchandise; they do not show that YUSCO knew or had reason to know that the sales it reported as third-country sales and excluded from its home market sales listing were in fact exported without further processing. In fact, one of the cited excerpts specifically states that "some of the UZ sales are thought to be further-processed before exportation." Sales Verification Report at 7.

YUSCO's arguments regarding the Department's classification of the UZ sales do not reveal any error in that aspect of the Final Determination.

**(4)**

### Commerce Applied the Correct Standard in Determining That the U and UZ Sales Were Home Market Sales

The statutory scheme does not provide explicit criteria for determining whether a sale is for export or is a home market sale. LG Semicon Co., Ltd. v. United States, 1999 WL 1458844 at *3 (CIT Dec. 30, 1999). Export sales are governed by 19 U.S.C. § 1677a(a), which defines the term "export price" as:

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

19 U.S.C. § 1677a(a) (1994). Normal value, an adjusted price derived from home market sales, is defined under the following relevant subsection of 19 U.S.C. § 1677b(a)(1)(B):

---

[45]    YUSCO has also argued that its "UZ" sales into bonded warehouses should be classified as export sales, because goods sold into such warehouses are generally exported. YUSCO abandoned this claim at oral argument.

(i)      the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price[.]

19 U.S.C. § 1677b(a)(1)(B)(i) (1994).

In implementing the provisions of 19 U.S.C. § 1677b(a), sales should be included within the home market database if the producer "knew or should have known that the merchandise was . . . for home consumption based upon the particular facts and circumstances surrounding the sales." INA Walzlager Schaeffler KG, 21 CIT at 123-24, 957 F. Supp. at 264 (footnotes omitted). On the other hand, in implementing the provisions of 19 U.S.C. § 1677a(a), Commerce looks to whether the producer knew or should have known, at the time of a sale, whether or not the subject merchandise will be exported. See LG Semicon Co., 1999 WL 1458844 at *4 (listing examples of Commerce's application of the knowledge test); Yue Pak, Ltd. v. United States ITA, 20 CIT 495 (1996), aff'd, 111 F.3d 142 (Fed. Cir. 1997). This test reflects the guidance of the Statement of Administrative Action which accompanied the Trade Agreements Act of 1979: "if the producer knew or had reason to know that the goods were for sale to an unrelated U.S. buyer . . . the producer's sales price will be used as 'purchase price' to be compared with that producer's foreign market value." S.R. Doc. No. 96-249, at 411 (1979).

In determining whether the producer knew or should have known that the subject merchandise will be exported, Commerce looks in part to the place where the product is "consumed". Merchandise cannot be "sold . . . for consumption in the exporting country", 19 U.S.C. § 1677b(a)(1)(B)(i), if it has already been consumed in the home market. Merchandise sold in the home market, even if ultimately destined for export, is "consumed" in the home market if it is used there to produce non-subject merchandise prior to exportation. See Final Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-Resistant Carbon Steel Flat

Products, and Certain Cut-to-Length Carbon Steel Plate From Korea, 58 Fed. Reg. 37,176,

37,182 (Dep't Commerce) (July 9, 1993); Final Determination of Sales at Less Than Fair Value:

Dynamic Random Access Memory Semiconductors of One Megabit and Above From the

Republic of Korea, 58 Fed. Reg. 15,467, 15,473 (Dep't Commerce) (March 23, 1993).  Compare

LG Semicon, 1999 WL 1458844 at *6 (finding that goods were not "consumed" in Mexico

where the producer knew or should have known that the goods it sold to the business there "most

likely could not be processed by that entity or absorbed by the Mexican or Latin American

markets, and instead were destined for export to the United States.").

Although YUSCO acknowledges this governing legal standard, it claims that "the market

of a respondent's sales shall be determined based upon the respondent's actual knowledge of the

final destination at the time of sale."  YUSCO Moving Brief at 24.  This argument fails.

YUSCO bases its actual knowledge argument on a flawed reading of this court's opinion

in INA Walzlager Schaeffler KG, 957 F. Supp. 251.[46]  INA Walzlager Schaeffler KG follows the

---

[46]     YUSCO also cites certain Commerce determinations which, it claims, reflect an
established practice for Commerce to determine the market of the respondent's sales based on the
respondent's actual knowledge at the time of sale.  YUSCO Moving Brief at 24 (citing, e.g.,
Final Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat
Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-Resistant Carbon
Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate From Korea, 58 Fed. Reg.
37,176 (Dep't Commerce) (July 9, 1993), and Notice of Final Determination of Sales at Less
Than Fair Value: Fresh Atlantic Salmon From Chile, 63 Fed. Reg. 31,411 (Dep't Commerce)
(June 9, 1998)).  None of these supports YUSCO's position.

   In Certain Steel Plate From Korea, Commerce

   included in the home market sales databases and the calculation of FMV those
   local sales which are further manufactured into merchandise outside the scope of
   these investigations, in accordance with our practice in DRAMs from Korea.
   Where a product within the scope of an investigation has been transformed into a
   product outside that scope before exportation, we consider that product to have
   been "consumed" within the country, and thus properly includable in home market
   sales.

Certain Steel Plate From Korea, 58 Fed. Reg. at 37,182.  As to other local customers which

line of authority holding that

> the appropriate burden of proof for determining whether to exclude sales from the home market database in calculating FMV is whether [the producer] knew or should have known that the merchandise was not for home consumption based upon the particular facts and circumstances surrounding the sales.

INA Walzlager Schaeffler KG, 957 F. Supp. at 263-64.  The INA Walzlager Schaeffler KG court quoted language requiring Commerce "to diligently inquire into . . . allegations" where "the petitioner has provided Commerce with evidence which a reasonable mind would accept as calling into question whether respondents were able to distinguish home market sales destined for consumption in the home market from home market sales destined for consumption in the U.S. market[.]" Id. at 264 (punctuation and citation omitted).  The court concluded, however, that facts similar to those presented here required a finding of imputed knowledge.  The court rejected the producer's argument that "unless [the producer] knew the specific destination of the merchandise and actually admitted to such knowledge, Commerce cannot find [it] should have known the reseller would export the merchandise." Id. at 265.  "[U]nder those circumstances, it would be extremely difficult for Commerce to ever conclude that a respondent knew sales were for export[.]" Id.  "The only way to determine actual knowledge is through an admission of the respondent." Id.  Presumptive reliance on such statements would require deference to self-serving allegations even in the face of contrary evidence that the producer should have known the true place of consumption of the subject goods.  That would eviscerate the acknowledged

---

further manufactured the merchandise into both subject and non-subject merchandise, Commerce "excluded [that merchandise] from the home market databases since there is no way to determine the nature of the finished product that was exported from Korea, nor is there any evidence that [the respondent] knew the nature of that product." Id.

Similarly, in Fresh Atlantic Salmon, Commerce disregarded the producer's assertion of a lack of actual knowledge, focusing on record evidence of knowledge by the consignee, which was imputed to the producer.  See Fresh Atlantic Salmon, 63 Fed. Reg. at 31,411.

standard.

YUSCO also argues that it had actual knowledge at the time of sale through its order coding system that the U* and UZ sales would be exported and not consumed in the home market. YUSCO Moving Brief at 25. In point of fact, Commerce relied on admissions by YUSCO that it had actual knowledge that sales to its home market customers would be further manufactured prior to export. These admissions are buttressed by a review of the record evidence, which consistently supports Commerce's conclusion.

YUSCO's arguments that its indirect export sales were not home market sales all rest ultimately on YUSCO's internal order coding system and documentation, which the record demonstrates were flawed from inception as methods of categorizing sales in conformance with Commerce's instructions and the United States antidumping laws. These arguments fail in the face of YUSCO's repeated admissions that it knew that its customers further manufactured much of their purchases of its product domestically. That knowledge provides substantial evidence supporting Commerce's determination that YUSCO knew or should have known that its indirect export sales would be further manufactured in YUSCO's home market and should properly have been included in the list of home market sales provided to Commerce.

**b**

**Commerce Properly Resorted to Adverse Facts Available**

YUSCO contends that the Final Determination "fail[ed] to explain how YUSCO's alleged exclusion of UZ sales and other indirect export sales from its home market sales listing rose beyond the level of an inadvertent omission so as to constitute a failure to cooperate." YUSCO Moving Brief at 29. In other words, YUSCO argues that Commerce has not indicated

the presence of facts which would justify the imposition of adverse facts available.[47]

For an adverse facts available determination "to be supported by substantial evidence, Commerce must articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation." Mannesmannrohren-Werke AG v. United States, 77 F. Supp. 2d 1302, 1313-14 (CIT 1999); accord Ferro Union, Inc. v. United States, 44 F. Supp. 2d 1310, 1330-31 (CIT 1999). Where Commerce concludes that the respondent wilfully tried to withhold requested information, Commerce should "explicitly state such a conclusion, [and] identify why [the] errors [are something] more than inadvertent omissions." Mannesmannrohren-Werke, 77 F. Supp. 2d at 1315. "A respondent can fail to respond because it was not able to obtain the requested information, did not properly understand the question asked, or simply overlooked a particular request." Id. at 1316. Commerce must rather explain why an omission is a deliberate evasion, rather than an oversight. Id. Insufficient attention to statutory duties under the unfair trade laws can also be sufficient to warrant adverse treatment. Nippon Steel Corp. v. United States, 118 F. Supp. 2d 1366, 1379 (CIT 2000). "It implies an unwillingness to comply or

---

[47]     19 U.S.C. § 1677e(b) governs the use of adverse facts available in an antidumping investigation, and provides:

    (b)     Adverse inferences.
        If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from–
        (1)     the petition,
        (2)     a final determination in the investigation under this title,
        (3)     any previous review under section 1675 of this title or determination under section 1675b of this title, or
        (4)     any other information placed on the record.
19 U.S.C. § 1677e(b) (1994).

reckless disregard of compliance standards.  Commerce must be in a position to compel

meaningful attention to and compliance with its requests." Id.  The deficient response  must be

analyzed in light of the respondent's overall conduct, the importance of the information, the

particular time pressures of the investigation, and any other information that bears on the issue of

whether the deficiency was an excusable inadvertence or a demonstration of a lack of regard for

its responsibilities in the investigation.  Id.

> YUSCO argues that it was
>
> fully cooperative throughout this investigation and acted to the best of its ability.
> In fact, the Department's sales and cost verification reports attest to the high level
> of YUSCO's cooperation and accuracy and completeness of YUSCO's responses.
> Except for minor errors, the Department found at verification no discrepancies in
> YUSCO's reported U.S. and home market sales, and COP and CV data.

YUSCO Moving Brief at 28-29.  YUSCO thus argues that Commerce erred as a matter of law in

applying adverse facts available. Id. at 28.  YUSCO's argument lacks legal or factual substance.

Commerce found in the Final Determination that "YUSCO failed to cooperate to the best

of its ability . . . because YUSCO failed to follow the Department's instructions to report all home

market sales." Final Determination, 64 Fed. Reg. at 30,599.  This finding, coupled with the more

detailed analysis earlier in the Final Determination, 64 Fed. Reg. at 30,598-99, regarding the

details of Commerce's instructions and the shortfalls in YUSCO's adherence to those instructions,

as well as the related analysis in the May 19, 1999 Facts Available Memorandum, at 1-3, is

sufficiently explicit under § 1677e(b).  Commerce's findings show that YUSCO failed to report

approximately one fifth of its home market sales, a reporting failure that goes to the heart of a

dumping investigation.  Commerce stated, and YUSCO has not disputed, that it did not learn of

the deficiency until the week prior to verification.

This is not a situation such as Mannesmannrohren-Werke or Ferro Union, where the

shortcomings in the response were arguably due to the existence of new governing laws and

unclear requests by Commerce for information.  Here, Commerce fairly requested data regarding

home market sales, a term which was defined both in the questionnaire and by longstanding

practice. YUSCO certified in its November 18, 1998 questionnaire response that it had reported

all of its home market sales. The responsibility for the deficient response here rests squarely with

YUSCO, whose response displayed a disregard for the statute and for its responsibilities in the

investigation.[48]

     YUSCO then cites 19 U.S.C. § 1677m(d). 19 U.S.C. § 1677m provides the following

relevant provisions:

> (d)     Deficient submissions.
> If the administering authority or the Commission determines that a response to a request for information under this title does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this title. If that person submits further information in response to such deficiency and either–
> (1)     the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or
> (ii)     such response is not submitted within the applicable time limits, then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.
> (e)     Use of certain information
> In reaching a determination under section . . . 1675 . . . the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if–
> (1)     the information is submitted by the deadline established for its submission,

---

[48]     In light of this conclusion, the court also rejects YUSCO's contention that the Department erred in stating, in the Final Determination at 30,599, that it "had no opportunity to issue supplemental questionnaires regarding [the UZ sales]." YUSCO notes that the Department did in fact issue a supplemental questionnaire on January 13, 1999, five days after YUSCO first reported the UZ sales to Commerce, and that this included questions regarding the UZ sales. YUSCO Moving Brief at 16-17. YUSCO responded to this questionnaire two days later, on January 15, 1999. Because the court finds that Commerce had already "fairly requested" this information, the court concludes that Commerce was under no obligation to make a second request for that information.

      (2)     information can be verified,

      (3)     the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

      (4)     the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

      (5)     the information can be used without undue difficulties.

19 U.S.C. § 1677m(d) (1994) (emphasis added).

YUSCO claims that Commerce should have provided an opportunity for YUSCO to provide additional information in response to the deficiencies found at verification in YUSCO's reporting of its home market sales. YUSCO Moving Brief at 30. YUSCO says it did not become aware until verification that "the Department might consider 'U' sales or 'UZ' sales to be home market sales," and that it thus had a legitimate reason not to report those sales as home market sales. Id. at 31. YUSCO argues that Commerce is obligated to provide YUSCO with an opportunity to correct a misunderstanding such as this. Id. at 30-31.

YUSCO analogizes this situation to that in Ta Chen Stainless Steel Pipe, Ltd. v. United States, 1999 WL 1001194 (CIT Oct. 28, 1999). The court in that case found that Commerce failed to provide a sufficient opportunity to remedy a submission which the court found was deficient due to ambiguous requests by Commerce for information. Id. at *12. Commerce had "applied an adverse facts available margin to these sales because Ta Chen did not provide information on [its affiliate's] U.S. sales." Id. "Commerce could . . . foresee that in order to properly calculate Ta Chen's sales as CEP sales, it would need information on [its affiliate's] U.S. sales. But Commerce did not ask for this information specifically." Id. The Ta Chen court cautioned that

> broad questions initially asked of respondent do not discharge Commerce from its obligation to put parties on notice as to the deficiencies in their responses. The court will not endorse an investigation where Commerce sent out a general questionnaire and a brief deficiency letter, then effectively retreated into its bureaucratic shell, poised to penalize respondent for deficiencies not specified in

> the letter that Commerce would only disclose after it was too late, i.e., after the preliminary determination.

Id. at *13 (quotations and punctuation omitted) (citing Bowe-Passat v. United States, 17 CIT 335, 343 (1993)).  The linchpin of the court's finding rested on its conclusion that "Commerce has behaved in the same way as it did in Bowe-Passat by failing to notify the respondent of the deficiency when it had an opportunity to do so[.]"  Id.

This case differs from Ta Chen.  Commerce has not "hidden the ball" in its initial requests for information from YUSCO.  Commerce plainly requested data regarding all home market sales, defined the term, and invited respondents to contact it for clarification of any matter as to which it was unclear.  YUSCO has conceded that Commerce fairly requested this data.[49]   In response to this inquiry into home market sales, a defined term that is one of the central issues in any dumping investigation, YUSCO had a statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce.  Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1571-72 (Fed. Cir. 1990).  Commerce asked YUSCO to report all of its home market sales, which for several years have been defined as including all subject merchandise consumed (including merchandise further manufactured) within the home market.  See, e.g., Stainless Steel Plate From Korea, 58 Fed. Reg. at 37,182; DRAMs From Korea, 58 Fed. Reg. at 15,473.

In Ta Chen, "a new statute was not fully explained and Commerce suspected that" there would be a need for additional information.  Ta Chen, 1999 WL 1001194 at *14.  The standards for home market sales are clear.  In addition, here YUSCO admittedly had knowledge that at least some of its customers further manufactured its merchandise prior to export, thus providing a

---

[49]      This concession negates YUSCO's argument that "broad questions asked initially of the respondent in the original questionnaires do not 'discharge [the Department] from its obligation to put parties on notice as to the deficiencies in their responses.'" YUSCO Moving Brief at 30, quoting Usinor Sacilor v. United States, 19 CIT 711, 745, 893 F. Supp. 1112, 1141-42 (1995), rev'd in part, 215 F.3d 1350 (Fed. Cir. 1999).  In any event, Usinor Sacilor is inapposite, because it was a countervailing duty case, and did not discuss the provisions of 19 U.S.C. § 1677m, which are controlling here.

reason for YUSCO to inquire further in the course of preparing its response to Commerce. Commerce, on the other hand, had no reason to realize prior to verification that the information thus far provided to it was deficient. YUSCO had certified in its November 18, 1998 questionnaire response that it had reported all of its home market sales. The deficiencies in YUSCO's responses do not fall within the scenario described in Ta Chen.

Nor do the terms of § 1677m(d) give rise to an obligation for Commerce to permit a remedial response by YUSCO. Its remedial provisions are not triggered unless the respondent has met all of the five enumerated criteria. Failure to fulfill any one criterion renders § 1677m(d) inapplicable.

YUSCO failed to meet two of these criteria. First, YUSCO's indirect export sales listings were not sufficiently complete for incorporation into the rest of the data; they provided data on only a few of fifty data categories required by Commerce. Such shortcomings would threaten the accuracy of the resulting margin calculations. Second, the belated information could not be used without undue difficulties, for its incorporation would have required the gathering and verification by Commerce of data for the additional data fields ignored by YUSCO, or Commerce would have had to reduce the precision of its dumping calculations by discarding the remaining categories of data. See Final Determination, 64 Fed. Reg. at 30,599. This court cannot say that completion of those tasks at that late date did not present an undue difficulty.

YUSCO also asserts that inclusion of the "U" and "UZ" sales in its home market sales would have favored YUSCO, by lowering the average per-unit home market price. YUSCO Moving Brief at 29 n.42. In support of this assertion, YUSCO cites the Facts Available Memorandum, at 4, which shows tonnage and aggregate value for the reported home market sales, and the reported home market sales augmented by the UZ and U sales. Expression of those figures as a ratio shows a lower price per ton of the home market sales if the UZ and U sales are included than if YUSCO's original reported numbers are used.

The UZ and U numbers are crude, however, and do not reflect the more sophisticated 50-field analysis that Commerce prepares when provided with a complete response. It is undisputed that YUSCO did not provide information for the full range of data fields for the UZ and U sales when Commerce requested that information at verification, upon its discovery that those sales were properly includable in the home market sales database. Commerce contends that omission of numerous fields of information for the UZ sales prevented Commerce from matching transactions, and that YUSCO provided no sales listing or fields at all for its U* sales, for which it provided only volume and value information. Defendant Opposition Brief at 41. YUSCO makes no response to this argument regarding the U* sales, and argues that fields omitted for the UZ sales were immaterial, and that the omitted information had already been provided. Reply Brief Memorandum [sic] of Points and Authorities in Support of Yieh United Steel Corp.'s Motion for Judgment Upon the Agency Record ("YUSCO Reply Brief") at 7 and nn. 23, 26. YUSCO also contends that the Department was obligated to ask it for the full sales listing for the UZ and U* sales. See id. at 7.

YUSCO next contends that its January 8, 1999 submission contained all of the product characteristics necessary for Commerce's analysis. Id. at 7 n.23. YUSCO provided information for 10 fields for the "UZ" sales, and for 11 fields for the "U" sales. See Response Brief of Plaintiffs at 11-12 for a listing of those fields. YUSCO argued in its Reply Brief that it had already provided some of the remaining fields in the sales verification exhibits (though it does not indicate which ones). YUSCO Reply Brief at 7 n.23. Review of YUSCO's September 25, 1998 Response appears to indicate that many of the answers set forth therein would apply to the UZ sales without further supplementation. See, e.g., YUSCO Sept. 25, 1998 Response to Questionnaire at B-21 through B-26, fields 16.2, 16.3, 19.1 (providing generic responses for certain fields), and 18.1-n and 20.1-n (indicating that there was no responsive data to report). YUSCO also argued that the remaining fields relate to expenses which would reduce normal

value, and which Commerce normally denies absent proper proof by the respondent. See RHP

Bearings v. United States, 19 CIT 133, 139, 875 F. Supp. 854, 859 (1995). Examination of the

September 25, 1998 Response reveals, however, several fields which YUSCO treated on a

transaction-specific basis and which do not fall squarely under the heading of "expenses". See,

e.g., YUSCO Sept. 25, 1998 Response to Questionnaire at B-17 through B-19, fields 12.0, 13.0,

14.0 (date of receipt of payment, terms of delivery, terms of payment). These missing fields, and

the complete lack of matching data for the U* sales, appear to substantiate Commerce's position

that the matching needed for a proper margin computation was adversely impacted. On these

facts, the court cannot say this determination was not supported by substantial evidence.

The court finds no error in Commerce's application of adverse facts available.

**c**

**Commerce Properly Included YUSCO's Sales to Yieh Mau
Within YUSCO's Export Sales**

YUSCO next argues that the margin assigned to it was distorted because Commerce

treated YUSCO's sales to Yieh Mau as part of YUSCO's United States sales, rather than as part

of YUSCO's home market database, as YUSCO had reported the sales. YUSCO Moving Brief at

37. The inclusion of these additional sales impacted the weighted average margin rate, because it

increased the quantity of sales in certain categories, thus affecting the weight accorded to those

categories in the margin calculation.

YUSCO does not dispute that YUSCO and Yieh Mau are affiliated. Id. YUSCO

contends, however, that the department did not explain why this affiliation warranted the

treatment of sales to Yieh Mau as U.S. sales. Id. In fact, Commerce did provide an explanation

for its treatment of the Yieh Mau sales as U.S. sales: it did so as part of its adverse facts

determination. Final Determination, 64 Fed. Reg. at 30,606. Treatment of the Yieh Mau sales as

U.S. sales, rather than home market sales, was thus the drawing of an inference adverse to

YUSCO, in the face of a record that shows that Yieh Mau resold some of the subject merchandise

from YUSCO, further-processed some of YUSCO's merchandise into other subject merchandise,

and consumed still other amounts of YUSCO's subject merchandise, and that YUSCO was not

able to identify how much of its merchandise fell within each of these three categories.

YUSCO also contends that the Department was required to apply the arm's length test,

under 19 C.F.R. § 351.403(c), to determine whether the Yieh Mau sales should be treated as home

market sales.  YUSCO Moving Brief at 37.  This section provides that:

> If an exporter or producer sold the foreign like product to an affiliated party, the
> Secretary may calculate normal value based on that sale only if satisfied that the
> price is comparable to the price at which the exporter or producer sold the foreign
> like product to a person who is not affiliated with the seller.

19 C.F.R. § 351.403(c) (1998).  For this provision to apply, Commerce must first find that the

sales in question are "foreign like product."  Instead, Commerce concluded that the sales to Yieh

Mau were of subject merchandise.  This provision is thus inapplicable.

YUSCO also states that "[i]t is also undisputed that Yieh Mau was one of YUSCO's home

market customers during the POI."  YUSCO Moving Brief at 38. YUSCO provides no record

support for this assertion, nor does the court find any.  YUSCO simply argues that it did not know

at the time of sale whether Yieh Mau would sell YUSCO's SSSS to home market or foreign

customers.  That is not enough.

**d**

**YUSCO's Reported Cost of Manufacture**

YUSCO contends that Commerce erred in adjusting YUSCO's cost of manufacture, based

on Commerce's determination that YUSCO did not identify and quantify all differences between

its submitted COP and CV data, on the one hand, and its audited financial statement, on the other

hand.  Id. at 38.

The Government argues that the cost adjustment issue is not yet ripe for adjudication, and

thus is not justiciable, because Commerce utilized total adverse facts available, such that the

margin imposed did not rest in any way on the adjusted COP and CV.  Defendant Opposition

Brief at 47.

> [The] basic rationale [of the ripeness doctrine] is to prevent the courts, through
> avoidance of premature adjudication, from entangling themselves in abstract
> disagreements over administrative policies, and also to protect the agencies from
> judicial interference until an administrative decision has been formalized and its
> effects felt in a concrete way by the challenging parties.  The problem is best seen
> in a twofold aspect, requiring us to evaluate both the fitness of the issues for
> judicial decision and the hardship to the parties of withholding court consideration.

Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967).  The Supreme Court thus requires

application of a two-part test to determine whether a case is ripe for judicial action.  First, the

court must determine whether the issues are fit for judicial decision--that is, whether there is a

present case or controversy between the parties, see Lake Carriers' Ass'n v. MacMullan, 406 U.S.

498, 506 (1972); BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 977 (Fed. Cir. 1993); and

second, whether there is sufficient risk of immediate hardship to warrant prompt adjudication --

that is, whether withholding judicial decision would work undue hardship on the parties,

MacMullan, 406 U.S. at 509; Pacific Gas & Elec. Co. v. State Energy Resources Conservation &

Dev. Comm'n, 461 U.S. 190, 200-01 (1983). Both prongs must be satisfied before an Article III

court may apply its adjudicative powers to a case's merits.

This issue is indeed not yet ripe for adjudication.  There is no actual controversy between

the parties, because Commerce did not set the cash deposit rate based in whole or in part upon the

adjusted cost of manufacturing.  The cash deposit rate imposed rests entirely on total adverse facts

available. YUSCO has not been injured in any way by Commerce's decision to adjust the cost of manufacturing. Commerce did not rest its facts available determination upon its conclusion that the cost of manufacturing required adjustment. A decision by this court in YUSCO's favor on this issue would be purely advisory and would result in no benefit whatsoever to YUSCO. If YUSCO were to appeal on the issues of facts available and adverse facts available, and to prevail on both issues, such that Commerce were somehow wholly precluded from applying either provision, the case would be remanded to Commerce for calculation of the proper margin. Unless and until these events have come to pass, there is no controversy for this court to adjudicate.

## IV

## CONCLUSION

For the foregoing reasons, the Court remands this case to Commerce for consideration of the issues discussed herein. In all other respects, the Department's Final Determination is affirmed.

_____
Evan J. Wallach, Judge


Dated:        July 3, 2001
              New York, New York

# ERRATA

Tung Mung Development Company, Ltd. v. United States, Court No. 99-07-00457, Slip Op. 01-83, dated July 3, 2001.

- On page 8, delete:

  "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana, S.A., 10 CIT at 404-5, 636 F. Supp. at 966.

- On page 27, insert a footnote immediately after the word "reasonableness" in the following sentence: "There is thus nothing there for the court to analyze for reasonableness or substantial evidence."

  The footnote shall be as follows:

  By use of the word "reasonableness", the court references the factors identified in United States v. Mead, 2001 WL 672258 at *6 (U.S. June 18, 2001) ("[T]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.").

August 29, 2001